No. 24-6166

CAPITAL CASE

---

## IN THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

---

RONNIE EUGENE FUSTON,

*Petitioner-Appellant*,

v.

CHRISTE QUICK, WARDEN,
OKLAHOMA STATE PENITENTIARY,

*Respondent-Appellee.*

---

## OPENING BRIEF OF PETITIONER-APPELLANT RONNIE EUGENE FUSTON

---

Appeal from the United States District Court
for the Western District of Oklahoma

---

Callie Heller, Texas Bar #24101897
Assistant Federal Public Defender
EMMA V. ROLLS, OBA #18820
First Assistant Federal Public Defender
Office of the Federal Public Defender
Western District of Oklahoma
215 Dean A. McGee, Suite 707
Oklahoma City, OK 73102
405-609-5975 (phone)
Callie_Heller@fd.org
Emma_Rolls@fd.org

COUNSEL FOR PETITIONER-APPELLANT

July 21, 2025

# **TABLE OF CONTENTS**

TABLE OF CONTENTS..............................................................................i

ATTACHMENTS....................................................................................ii

TABLE OF AUTHORITIES ...................................................................iii

GLOSSARY OF ABBREVIATIONS TO RECORD REFERENCES ....................1

PRIOR OR RELATED APPEALS..........................................................1

JURISDICTION....................................................................................1

STATEMENT OF THE ISSUES.............................................................2

STATEMENT OF THE CASE................................................................2

STATEMENT OF FACTS ......................................................................3

SUMMARY OF ARGUMENT ...............................................................12

STANDARD OF REVIEW ....................................................................12

PROPOSITION ONE ...........................................................................14

    THE TRIAL COURT'S FAILURE TO INSTRUCT ON A LESSER
        INCLUDED OFFENSE VIOLATED MR. FUSTON'S FOURTEENTH
        AMENDMENT RIGHTS...........................................................14

    A.   Where the Claim Was Raised. ..............................................14

    B.   Legal Standard......................................................................14

    C.   Fairminded Jurists Could Not Disagree that OCCA's Adjudication
        Contravened *Beck*...............................................................16

     1.   Proceedings Below................................................................16

     2.   The District Court Erroneously Upheld OCCA's Unreasonable
        Application of *Beck*...........................................................19

       a.   OCCA Continues a History of Problematic *Beck* Adjudications. .......20

       b.   OCCA's Adjudication Falls Under § 2254(d)(1). Under a Reasonable
          *Beck* Application, Mr. Fuston Was Entitled to a Second-Degree
          Murder Instruction. ........................................................28

       c.   Mr. Fuston's Case Is Distinct from the Cases Where this Court Has
          Found no *Beck* Error. ....................................................40

     3.   The District Court Erroneously Upheld OCCA's Unreasonable
        Determination of Facts.......................................................49

CONCLUSION ....................................................................................54

STATEMENT REGARDING ORAL ARGUMENT ..............................................54

CERTIFICATE OF DIGITAL SUBMISSION .......................................................55

CERTIFICATE OF COMPLIANCE.......................................................................55

## <u>ATTACHMENTS</u>

A.     Opinion and Judgment, *Fuston v. Quick,* CIV-21-179-SLP (07/12/2024)

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Beck v. Alabama*,
   447 U.S. 625 (1980).. 14, 15, 16, 20, 21, 22, 23, 24, 25, 26, 27, 28, 30, 31, 34, 38,
   40, 41, 43, 45, 47, 48, 49, 51

*Bland v. Sirmons*,
   459 F.3d 999 (10th Cir. 2006) ................................................................47

*Boyd v. Ward*,
   179 F.3d 904 (10th Cir. 1999) ................................................................43

*Brown v. Sirmons*,
   515 F.3d 1072 (10th Cir. 2008) ...............................................................48

*Brumfield v. Cain*,
   576 U.S. 305,  135 S.Ct. 2269 (2015)........................................................52

*Bryson v. State*,
   876 P.2d 240 (Okla. Crim. App. 1994)......................................................45

*Bryson v. Ward*,
   187 F.3d 1193 (10th Cir. 1999) .......................................................... 44, 45

*Burt v. Titlow*,
   571 U.S. 12 (2013)...............................................................................13

*Campbell v. Coyle*,
   260 F.3d 531 (6th Cir. 2001) ..................................................................21

*Charm v. Mullin*,
   37 F. App'x 475 (10th Cir. 2002) ............................................................45

*Charm v. State*,
   924 P.2d 754 (Okla. Crim. App. 1996)......................................................45

*Darks v. Mullin*,
   327 F.3d 1001 (10th Cir. 2003) ....................................... 23, 24, 40, 50

*Darks v. State*,
   954 P.2d 152 (Okla. Crim. App. 1998)......................................................23

*Eizember v. Trammell*,
   803 F.3d 1129 (10th Cir. 2015) ...............................................................47

*Fairchild v. Trammell*,
   784 F.3d 702 (10th Cir. 2015) ................................................................48

*Fowler v. Ward*,
   200 F.3d 1302 (10th Cir. 2000) ...............................................................48

*Frazier v. State*,
   654 P.2d 639 (Okla. Crim. App. 1982)......................................................39

*Fuston v. State*,
   141 S.Ct. 1400 (2021).............................................................................2

*Fuston v. State*,
　470 P.3d 306 (Okla. Crim. App. 2020)........................ 2, 18, 29, 30, 31, 32, 33, 52
*Fuston v. State*,
　PCD-2017-806 (Okla. Crim. App. June 18, 2020) ..................................................3
*Fuston v. State*,
　PCD-2022-286 (Okla. Crim. App. July 7, 2022)....................................................3
*Gilson v. Sirmons*,
　520 F.3d 1196 (10th Cir. 2008) ............................................................ 40, 50, 51
*Gilson v. Sirmons*,
　No. 06-6287, 2007 WL 2724126 (10th Cir. July 25, 2007) ................................51
*Grant v. Trammell*,
　727 F.3d 1006 (10th Cir. 2013) .................................................................. 46, 47
*Grissom v. Carpenter*,
　902 F.3d 1265 (10th Cir. 2018) .................................................................. 45, 46
*Harrington v. Richter*,
　562 U.S. 86 (2011)...................................................................... 13, 38, 49
*Hogan v. Gibson*,
　197 F.3d 1297 (10th Cir. 1999) .............................. 23, 34, 35, 36, 37, 39, 40, 52
*Hogan v. State*,
　877 P.2d 1157 (Okla. Crim. App. 1994).............................................................23
*Hogan v. Trammell*,
　511 F. App'x 769 (10th Cir. 2013) ....................................................................48
*Hooker v. Mullin*,
　293 F.3d 1232 (10th Cir. 2002) ........................................................................41
*Hooker v. State*,
　887 P.2d 1351 (Okla. Crim. App. 1994).............................................................41
*Hooks v. Ward*,
　184 F.3d 1206 (10th Cir. 1999) ............................................... 22, 34, 43, 48
*James v. Gibson*,
　211 F.3d 543 (10th Cir. 2000) .........................................................................48
*Keeble v. United States*,
　412 U.S. 205 (2004)........................................................................................14
*King v. Emmons*,
　144 S.Ct. 2501 (2024).....................................................................................53
*Malicoat v. Mullin*,
　426 F.3d 1241 (10th Cir. 2005) ........................................................................48
*Martinez v. State*,
　371 P.3d 1100 (Okla. Crim. App. 2016).............................................................38
*Meek v. Martin*,
　74 F.4th 1223 (10th Cir. 2023) ........................................................................47

iv

*Miller-El v. Cockrell*,
  537 U.S. 322, 123 S.Ct. 1029 (2003)....................................................................52
*Miller-El v. Dretke*,
  545 U.S. 231 (2005)........................................................................ 13, 52
*Mitchell v. Gibson*,
  262 F.3d 1036 (10th Cir. 2001) ............................................ 15, 22, 34, 35, 38, 42
*Mitchell v. State*,
  884 P.2d 1186 (Okla. Crim App. 1994)................................................................35
*Moore v. Marr*,
  254 F.3d 1235 (10th Cir. 2001) ........................................................................48
*Patton v. Mullin*,
  425 F.3d 788 (10th Cir. 2005) ..........................................................................48
*Paxton v. Ward*,
  199 F.3d 1197 (10th Cir. 1999) ........................................................................48
*Phillips v. State*,
  989 P.2d 1017 (Okla. Crim. App. 1999)................................................................24
*Phillips v. Workman*,
  604 F.3d 1202 (10th Cir. 2010) ........................................ 20, 21, 24, 34, 37, 40, 53
*Richie v. Workman*,
  599 F.3d 1131 (10th Cir. 2010) ................................................ 21, 25, 26, 34, 35
*Robedeaux v. Gibson*,
  No. 98-6021, 1999 WL 672305 (10th Cir. July 8, 1999) ............................ 41, 42
*Saiz v. Ortiz*,
  392 F.3d 1166 (10th Cir. 2004) ................................................................ 12, 13
*Simpson v. Carpenter*,
  912 F.3d 542 (10th Cir. 2018) ..................................................................... 35, 47
*Smith v. Gibson*,
  197 F.3d 454 (10th Cir. 1999) ..........................................................................48
*Spaziano v. Florida*,
  468 U.S. 447 (1984)........................................................................................15
*Spears v. Mullin*,
  343 F.3d 1215 (10th Cir. 2003) ........................................................................48
*Taylor v. State*,
  998 P.2d 1225 (Okla. Crim. App. 2000)........................................................ 27, 38
*Taylor v. Workman*,
  554 F.3d 879 (10th Cir. 2009) ............................................ 27, 36, 37, 39, 40, 51
*Thornburg v. Mullin*,
  422 F.3d 1113 (10th Cir. 2005) ........................................................................48
*Turrentine v. Mullin*,
  390 F.3d 1181 (10th Cir. 2004) ...................................................... 14, 26, 27, 40

*Turrentine v. State*,
   965 P.2d 967 (Okla. Crim. App. 1998)................................................26
*United States v. Gantt*,
   679 F.3d 1240 (10th Cir. 2012) ........................................................13
*United States v. Hicks*,
   116 F.4th 1109 (10th Cir. 2024) ......................................................36
*Valdez v. Ward*,
   219 F.3d 1222 (10th Cir. 2000) .......................................................48
*Welch v. Workman*,
   639 F.3d 980 (10th Cir. 2011) .........................................................47
*Wiggins v. Smith*,
   539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)......................................52
*Williams v. State*,
   22 P.3d 702 (Okla. Crim. App. 2001).................................................25
*Williams v. State*,
   513 P.2d 335 (Okla. Crim. App. 1973)................................................39
*Williams v. Taylor*,
   529 U.S. 362 (2000)............................................................. 22, 51
*Williams v. Trammell*,
   539 F. App'x 844 (10th Cir. 2013) ........................... 20, 21, 25, 51, 53
*Willingham v. Mullin*,
   296 F.3d 917 (10th Cir. 2002) .........................................................48
*Wilson v. Sirmons*,
   536 F.3d 1064 (10th Cir. 2008) .......................................................48
*Young v. Sirmons*,
   486 F.3d 655 (10th Cir. 2007) .................................................... 42, 43
*Young v. State*,
   12 P.3d 20 (Okla. Crim. App. 2000)............................................. 42, 43

**Statutes**
21 O.S. § 701.8(1)................................................................19
28 U.S.C. § 2253 ..................................................................2
28 U.S.C. § 2254 ...................................................... 1, 47, 48
28 U.S.C. § 2254(d)(1)............................... 13, 20, 22, 28, 41, 45, 49, 51
28 U.S.C. § 2254(d)(2)............................... 13, 41, 43, 45, 49, 50, 51, 54
28 U.S.C. § 2254(e) ................................................................47
28 U.S.C. § 2254(e)(1)............................................. 13, 22, 45

**Other Authorities**
2 R. Hertz & J. Liebman, Federal Habeas Corpus Practice and Procedure
   § 32.4 (7th ed. 2023)...........................................................52

**Rules**

Fed. R. App. P. 34(a) ...................................................................................54

Fed. R. App. P. 4(a) ......................................................................................2

**Constitutional Provisions**

U.S. Const. Amend. XIV .........................................................................2, 14

## GLOSSARY OF ABBREVIATIONS TO RECORD REFERENCES

ROA        Record on Appeal (two volumes of filings in the federal district court with volume followed by page number),

OR            Thirteen-volume consecutively paginated Original Record in Oklahoma County Case No. CF-2013-0438, followed by page number,

Tr.           Twelve-volume jury trial held May 22-June 8, 2017, CF-2013-0438, followed by volume number and page number.

## PRIOR OR RELATED APPEALS

There are no prior or related appeals to this Court.

## JURISDICTION

Petitioner/Appellant Ronnie Eugene Fuston invoked the jurisdiction of the district court pursuant to 28 U.S.C. § 2254 by timely filing his habeas petition February 15, 2022. ROA I at 29. The district court denied relief in its Memorandum Opinion and Judgment of July 12, 2024, No. 5:21-CV-00179-SLP (Attachment A), *see* ROA I at 1979, and denied a certificate of appealability on all grounds, ROA I at 1982. Senior Circuit Judge Michael Murphy granted a certificate of appealability (COA) on one ground from Mr. Fuston's Request for a Certificate of Appealability. *See* Order, *Fuston v. Quick*, No. 24-6166 (Apr. 22, 2025). Mr. Fuston timely requested a modified COA to also include his intellectual disability claim, which remains pending in this Court, and on which, if granted, Mr. Fuston reserves the right to submit additional briefing. *See* Mot., *Fuston v. Quick*, No. 24-6166 (May 2,

2025). The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 2253 and Fed. R. App. P. 4(a).

## STATEMENT OF THE ISSUES

The district court erred in denying relief or an evidentiary hearing on the following constitutional claims:

Ground IV: The trial court's failure to instruct on a lesser included offense violated the Fourteenth Amendment.

## STATEMENT OF THE CASE

On January 17, 2013, Mr. Fuston was charged in Oklahoma County District Court with first-degree malice aforethought murder in the October 20, 2012 death of Michael Rhodes. OR 1, 68. The State sought the death penalty. OR 152. Oklahoma County District Court Judge Ray Elliott presided over Mr. Fuston's trial. The jury returned a guilty verdict on June 1, 2017. Tr. XI at 2195. Following the penalty phase, the jury found two aggravating circumstances: 1) Mr. Fuston knowingly created a great risk of death to more than one person, and; 2) Mr. Fuston will probably commit criminal acts of violence constituting a continuing threat to society. Tr. XII at 2244.

Mr. Fuston appealed his conviction and sentence to the Oklahoma Court of Criminal Appeals (OCCA), who affirmed in a published opinion. *Fuston v. State*, 470 P.3d 306 (Okla. Crim. App. 2020), *cert. denied*, 141 S.Ct. 1400 (2021). Mr. Fuston also filed two applications for post-conviction relief, both of which were

denied in unpublished opinions. *Fuston v. State*, PCD-2017-806 (Okla. Crim. App. June 18, 2020); *Fuston v. State*, PCD-2022-286 (Okla. Crim. App. July 7, 2022).

Mr. Fuston timely filed his Petition for Writ of Habeas Corpus. ROA I at 29. The United States District Court for the Western District of Oklahoma denied habeas relief, discovery, an evidentiary hearing, and a certificate of appealability. ROA I at 1979-82. This appeal was timely commenced. ROA I at 1984.

## STATEMENT OF FACTS

Close to midnight on October 20, 2012, Michael Rhodes was shot and killed in his Oklahoma City home. He was on the couch with his three-year-old daughter when he was shot. Tr. 1384. Mr. Rhodes' older son was upstairs; he ran downstairs and called 911. *Id*. at 798-99. The shooting followed a dispute between Mr. Rhodes' niece, Brittany Dillard, and several girls. Though Mr. Fuston was not alleged to have been involved in the dispute, a detailed recounting of the events leading up to the shooting is necessary to establish how and why the crime took place, the role Mr. Fuston was convicted of playing in it, and the evidence that came out at trial.

Dillard was living with Mr. Rhodes in October 2012 after she and her siblings were placed in Department of Human Services custody. Tr. 645. Dillard's boyfriend, Tarell Howard, was at a funeral with other members of the 107 Hoover street gang

on the afternoon of October 19, 2012.[1] Dillard began calling him and a group of girls started answering his phone, irritating her. *Id*. at 646-48. After a verbal altercation with the girls, Dillard disconnected Howard's phone service. *Id*. at 653. Hostile calls continued between Dillard and the girls through the afternoon, and they arranged to physically fight, though it didn't happen. *Id*. at 654-59. Dillard identified the girls by their street gang nicknames: Lady Get One, Lady Bucky, and Lady Chunkem. *Id*. at 650. Though Dillard denied knowing them personally, she knew Lady Bucky's name was Atiana Jordan. *Id*. at 656.

Dillard testified a red, four-door car drove by her house repeatedly that afternoon. Tr. 657, 661. The last time, she was on the phone with her child's father, Christopher O'Neal, who said he was on his way over. *Id*. at 661. After hanging up, Dillard heard gunshots. *Id*. at 663. O'Neal arrived soon after, saying he shot at the girls out of his car window, *id*. at 664, which the girls confirmed upon calling Dillard back. *Id*. at 665. That evening, the red car came back, with the girls again calling Dillard. *Id*. at 665. Dillard ran to the front door in time to see a different car—a two-door black car with a male driver and female passenger—leaving the driveway. *Id*. at 667. Dillard could see the driver had tattoos on his hands and got another phone call, this time from a man calling himself "YT." *Id*. at 704. Dillard saw a rock inside

---

[1] Dillard denied Howard was a gang member, Tr. 651-52, but an Oklahoma City Police Department witness testified he was a Hoover. *Id*. at 1532.

the Rhodes home that had been thrown through the window and called the police. *Id*. at 666-67. She also discovered the car in the driveway had its tires slashed. *Id*. at 669-70. When Mr. Rhodes and his wife returned home that evening, he asked Dillard to leave. *Id*. at 672. Dillard spent the night of October 19 and following day elsewhere as the fighting phone calls and Facebook posts between her and the girls continued. *Id*. at 674-75.

O'Neal testified pursuant to a deal on an unrelated assault and robbery. Tr. 729-33. He said he was a Bloods gang member, who didn't get along with Howard's gang. *Id*. at 726-27. He also had personal issues with Howard, whom he knew as Buddha, stemming from their relationships with Dillard. *Id*. at 725. O'Neal testified to the shooting Dillard referenced; he had driven to a parking lot by the Rhodes' home after Dillard told him the girls were there. He saw five or six males and females standing outside their car, slowed down, and shot five to six times. *Id*. at 735-40.

The next day, October 20, O'Neal was attacked in a 7-Eleven parking lot by girls he knew as Ladies Bucky and Get One, with the one he knew as Lady Bucky pepper-spraying him. Howard and another boy, who O'Neal knew was one of the twin boys named "Naquan and Daquan," helped attack O'Neal. Tr. 743-46. Someone else drove O'Neal's car away, as he had been pepper-sprayed, *id*. at 747; O'Neal nonetheless testified to recognizing the car his assaulters ran to after the

beating as the same one he saw when he shot at the crowd the day before. *Id*. at 747-48.

Dillard's testimony further established Mr. Fuston's detachment from the events above. She had not seen Mr. Fuston at her house, did not know him, and had not previously heard his name. Tr. 713-14. O'Neal similarly testified he knew the nickname "Gutta"[2] but did not know who he was and had not seen the defendant at the 7-Eleven incident or previously. *Id*. at 751. The State instead connected Mr. Fuston to the homicide through cooperating witnesses and circumstantial evidence.[3]

Brian Butler, a friend of Mr. Fuston's from Enid, where they both lived, reached out to law enforcement following Butler's unrelated arrest on drug charges the following month. Tr. 1020-21. Serving as the State's star witness, he testified about the night of October 20. Butler testified he was with Mr. Fuston earlier that day when Mr. Fuston received a phone call from Oklahoma City girls who had gotten in a fight and wanted Mr. Fuston to come down from Enid. *Id*. at 1023-24. Butler claimed Mr. Fuston shared a gang association with the girls. *Id*. at 1025-26. Butler and Mr. Fuston went to Lady Bucky's apartment when they got to Oklahoma City,

---

[2] Mr. Fuston was charged with "Gutta" as his a/k/a. *See* Tr. 609.

[3] *See, e.g.*, Tr. 1680 (State guilt-phase closing argument, "I would submit to you that this case has a lot of circumstantial evidence."), Tr. 2906 (State emphasizing during penalty phase closing, "circumstantial evidence [is] given the same weight as direct evidence").

*id*. at 1027, joining people Butler identified as Lady Bucky, Lady Get One, a "young guy," another girl, and Buddha. *Id*. at 1031. Butler said Mr. Fuston was carrying a .45 automatic that Butler had previously seen him with. *Id*. at 1031-32.

According to Butler, when a gun Buddha was handling discharged, Butler left the apartment and waited in Mr. Fuston's Jeep. Tr. 1035-36. Mr. Fuston joined with Lady Bucky and "the young guy," who both got in the back seat. *Id*. at 1036. Mr. Fuston drove the Jeep to the south side of the city, with Buddha and Lady Get One doing the same in a dark-colored SUV. *Id*. at 1038-39. After some time spent driving around south Oklahoma City, Mr. Fuston received a call from Lady Get One in the other car; both cars then got on the freeway to "the girl's house" for "another fight." *Id*. at 1040-41. Butler testified the two cars pulled into a church parking lot, and after talking outside, Lady Bucky and Mr. Fuston got back in the Jeep, Buddha and Lady Get One got back in their car, and both cars drove down the street. *Id*. at 1042. Mr. Fuston told the "young guy" to get in the driver's seat.[4] *Id*. at 1045. Butler remained in the passenger seat. *Id*. at 1048.

Lady Bucky and Mr. Fuston, joined by Lady Get One and Buddha, "gathered up in the driveway"; the sound of three or four gunshots followed three or four minutes later. Tr. 1048. Butler stated Mr. Fuston and Lady Bucky came running back

---

[4] Butler claimed he did not know the young guy's name and had never seen him before that night. He identified him in a photo in St. Ex. 114. Tr. 1045-46. Later testimony established him as Da'Quan Paul. *See id*. at 1504.

to the Jeep, with Mr. Fuston snatching her in when she "acted like she didn't want to get in" because she said "they were supposed to kill everybody in the house." *Id*. at 1048-49. Butler denied seeing Buddha and Lady Get One come running back. *Id*. at 1049. Later in his testimony, Butler said when Mr. Fuston got back in the car, Mr. Fuston said he shot four times because "the dude was getting up or reaching for something." *Id*. at 1052. Butler testified that, after the "youngster" drove away from the scene, they got back on the freeway and dropped "them"[5] off at Lady Bucky's apartment before heading to Butler's cousin's apartment, *id*. at 1050-51, where Mr. Fuston washed his hands in gas and put the gun on the TV stand. *Id*. at 1053. Butler took a nap and as day broke, the two went back to Enid; Mr. Fuston called the phone company to change one of his cell phone numbers en route. *Id*. at 1054-55.

Butler admitted that, after reaching out to Oklahoma City Police Department (OCPD) detectives following his arrest on drug charges, he told them a version of these events omitting his own presence, instead claiming Fuston had confessed to him. Tr. 1060. His story changed only right before Mr. Fuston's February 2014 preliminary hearing, when Assistant District Attorney (ADA) Suzanne Lavenue told him in the hallway, "This is game time you need to tell the truth [sic]." He then admitted he hadn't told the police about being in the car. *Id*. at 1060-61. Butler

---

[5] This part of the testimony was inconsistent; Butler first said "we dropped them off at Lady Bucky's apartment," Tr. 1051, then affirmed "you and the driver and the defendant went to your cousin Timmy's apartment." *Id*.

denied that either ADA Lavenue or ADA Scott Rowland promised him a deal on his drug charge, testifying he had simply hoped for leniency. *Id*. at 1062. Butler wasn't sure if the charge was dismissed, but knew it did not proceed; he had been released to federal custody in Washington, where he had been under supervised release for a prior Alabama federal drug conviction. He also testified to two prior federal drug convictions. *Id*. at 1062-63. Despite the leniency he received, Butler denied that was the reason he testified. *Id*. at 1064-65.

The State connected the purported murder weapon to Mr. Fuston through more cooperating witnesses. Treylon Haley, Mr. Fuston's cousin, testified to a January 2013 jail call he received from Mr. Fuston where he asked Haley to go to Mr. Fuston's "momma's house and get some hammers," Tr. 1194-96, slang for guns. *See id*. at 1201. Haley asked their friend Ivan Williamson to do so via a Facebook message. *Id*. at 1198-99. Haley denied specific knowledge of which gun Mr. Fuston carried, testifying, "we all had guns," that Mr. Fuston had "not frequently" had firearms, *id*. at 1200, and on cross-examination, that their friends often passed guns amongst each other. *Id*. at 1207. He confirmed he received a Garfield County deal in exchange for cooperating. *Id*. at 1202-1203.[6]

---

[6] Haley, and the next witness discussed, Ivan Williamson, had been charged as accessories to murder in the 2012 Garfield County homicide for which Mr. Fuston was convicted and sentenced to life imprisonment without parole after a 2016 trial.

Ivan Williamson testified to the events following Haley's Facebook message, pursuant to a deal on his Garfield County accessory to murder charge. Tr. 1215-16. He retrieved one gun, wrapped in a shirt, from Mr. Fuston's mother's abandoned house in Enid, but knew there were more guns to incriminate "the circle," including him, given his fingerprints would likely be on any of the guns. *Id*. at 1221-22. Williamson went to a nearby abandoned lot and retrieved another gun, also wrapped in a shirt, from under the passenger seat of a car. *Id*. at 1226-27. He later unwrapped the shirts to find a HiPoint .45 and Taurus .45, and arranged on Facebook to sell both guns to acquaintance Casey Oakley. *Id*. at 1231-36. Oakley was presented both but bought only the more expensive Taurus, and planned to buy the HiPoint as well when he got paid. Tr. 1238. Enid officers retrieved the HiPoint from Williamson's home, *id*. at 1239, and the Taurus through Oakley and his attorney after discovering the Facebook messages between Oakley and Williamson. *Id*. at 1240-42, 1264-66 (testimony of Casey Oakley).[7]

The State connected the Taurus to the crime through OCPD firearms examiner Ronald Jones, who testified to the comparison testing conducted by former OCPD

---

[7] Oakley's recollection differed from Williamson; he testified Williamson brought only the Taurus for him to buy. Tr. 1264.

firearms examiner Patrick McLaughlin.[8] Tr. 1332. McLaughlin found, and Jones agreed in his peer review, the casings from the scene came from the same firearm. *Id*. at 1339-41. Based on comparison testing with the Taurus, Jones opined "to a reasonable degree of scientific certainty" the crime scene casings "were fired in that particular firearm." *Id*. at 1342.

OCPD Crime Scene Unit Sergeants Grayce Brotherton and Everett Baxter testified about the crime scene and reconstructed how the shooting had occurred based on the ballistics evidence. Sergeant Brotherton examined the scene and created a diagram, testifying that there was no indication or evidence "that anybody that had been involved had ever stepped over the threshold or into the residence[.]" Tr. 898, 903. Sergeant Baxter reconstructed the crime based on the evidence and diagram and testified that the shooting came "almost simultaneously" with the front door being kicked in. *Id*. at 953.[9] Sergeants Brotherton and Baxter both noted the presence of

---

[8] Jones peer-reviewed the testing. The only explanation given for not calling McLaughlin to testify to his own work was he "had taken a job in another state." Tr. 1326. Defense counsel did not pursue the matter further during cross-examination.

[9] OCPD officer Adam Roll testified the damage to the door frame was consistent with the door being kicked in. Tr. 824. There was no evidence as to whether Mr. Fuston or one of the three other people Butler claimed walked up to the door did the kicking. A shoeprint from the door was sent to the FBI, who determined the type of shoe was made for men and women. *Id*. at 1000. The FBI couldn't determine the shoe size, *id*., and an OCPD Crime Scene Unit officer was unable to opine on cross-examination whether the print could have come from a size 13, *id*. at 927-28, which Mr. Fuston's counsel claimed was Mr. Fuston's size. *See id*. at 628.

bullet defects in the front door, in a chair, and in the fireplace. *Id*. at 882-84, 895, 947-48.

The other major aspect of the State's forensic case was cell tower "ping" evidence, presented through OCPD analyst James Liles. Using "Cell Hawk" software, Liles mapped Mr. Fuston's movements the night of the crime based on which towers the numbers belonging to him and to the girls hit. Tr. 1584-85. The movements tracked Butler's account of the group's travels across the city. *Id*. at 1593-1602.

The defense put on no first phase witnesses. After nearly two hours, the jury returned its verdict. Tr. 1724-26.

Any additional facts will be presented as they relate to Mr. Fuston's claim.

## SUMMARY OF ARGUMENT

Mr. Fuston raises a single claim in this appeal: that he was entitled to the second-degree murder instruction that the trial court refused to grant. Under the clearly established federal law, given the facts of Mr. Fuston's case, the denial of a lesser included offense instruction constituted a violation of Mr. Fuston's right to due process under the Fourteenth Amendment.

## STANDARD OF REVIEW

This Court reviews "the district court's legal analysis of the state court decision de novo." *Saiz v. Ortiz*, 392 F.3d 1166, 1176 (10th Cir. 2004). If the district court's analysis depends entirely on the state record, the Court will review the state

record independently. *Id*. If the district court made factual findings, they are reviewed for clear error. *United States v. Gantt*, 679 F.3d 1240, 1246 (10th Cir. 2012). This Court's de novo review of the district court's legal analysis of the state court decision permits rebuttal of any factual findings. *Saiz*, 392 F.3d at 1176.

This Court's review is additionally governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). Under AEDPA, when a state court has considered a claim on the merits, this Court will reverse only if the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). The Court presumes the state court facts are correct, but the facts are rebuttable by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The U.S. Supreme Court has "not yet defined the precise relationship between § 2254(d)(2) and § 2254(e)(1)." *Burt v. Titlow*, 571 U.S. 12, 18 (2013).

An unreasonable decision is one "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). AEDPA's standards are "demanding but not insatiable" and "[d]eference does not by definition preclude relief." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).

13

<u>**PROPOSITION ONE**</u>

**THE TRIAL COURT'S FAILURE TO INSTRUCT ON A LESSER INCLUDED OFFENSE VIOLATED MR. FUSTON'S FOURTEENTH AMENDMENT RIGHTS.**

**A. Where the Claim Was Raised.**

This claim was raised as Ground Four of Mr. Fuston's habeas petition. ROA I at 121. The district court denied relief. ROA I at 1965.

**B. Legal Standard.**

The U.S. Supreme Court has long recognized the protection that lesser included offense instructions affords to criminal defendants.

> True, if the prosecution has not established beyond a reasonable doubt every element of the offense charged, and if no lesser offense instruction is offered, the jury must, as a theoretical matter, return a verdict of acquittal. But a defendant is entitled to a lesser offense instruction—in this context or any other—precisely because he should not be exposed to the substantial risk that the jury's practice will diverge from theory. Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction.

*Turrentine v. Mullin*, 390 F.3d 1181, 1193 (10th Cir. 2004) (quoting *Keeble v. United States*, 412 U.S. 205, 212-13 (2004)). In *Beck v. Alabama*, 447 U.S. 625 (1980), the Supreme Court emphasized the particular importance of such protection in capital cases.

> For when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the jury the "third option" of convicting on a lesser

> included offense would seem inevitably to enhance the risk of an unwarranted conviction.
> Such a risk cannot be tolerated in a case in which the defendant's life is at stake. As we have often stated, there is a significant constitutional difference between the death penalty and lesser punishments[.]

*Id*. at 637. *See also id*. at 642 ("[M]ost, if not all, jurors . . . abhor setting free a defendant where the evidence establishes his guilt of a serious crime.").

Recognizing this intolerable risk to the "reliability of the guilt determination," *id*. at 638, *Beck* established the due process requirement that capital trial jurors be provided a lesser included offense option when the evidence supports its possibility. *See Mitchell v. Gibson*, 262 F.3d 1036, 1049 (10th Cir. 2001) (quoting *Beck*, 447 U.S. at 627) ("After *Beck*, therefore, 'a sentence of death [may not] constitutionally be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict.'"); *id*. (quoting *Spaziano v. Florida*, 468 U.S. 447, 455 (1984) ("The goal of the *Beck* rule ... is to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence.")).

Thus, in lower courts' adjudications, "the inquiry mandated by *Beck* assess[es] whether the evidence at trial, viewed as a whole . . . warranted the giving of the lesser included offense instructions[]." *Mitchell*, 262 F.3d at 1050. This inquiry must "determine whether the evidence presented at trial would permit a

rational jury to find [a defendant] guilty of the lesser offenses and acquit him of first-degree murder." *Id*. (internal citations and quotation marks omitted).

### C. Fairminded Jurists Could Not Disagree that OCCA's Adjudication Contravened *Beck*.

OCCA has repeatedly failed to conform its *Beck* adjudications to that mandated by federal precedents, necessitating this Court's intervention. Mr. Fuston's case follows this familiar pattern and provides yet another instance of OCCA contravening *Beck*'s dictate by failing to properly consider whether the evidence could support a second-degree murder instruction. And the district court erred by upholding this faulty analysis.

#### 1. Proceedings Below.

Trial counsel twice requested the trial court instruct the jury as to the lesser included offense of second-degree depraved mind murder, first arguing:

> [T]he evidence is clear that this was a homicide that was done with a depraved mind, with a reckless disregard for life, but without the intent to kill. . . . [T]he kicking of the door and the firing on the home came fairly simultaneously. . .[B]ut for the fact that the homeowner was getting up the shots would have hit the fireplace and not him. And the evidence [is the] gang girls prior – their intentions towards the home was [sic] vandalism and it was not to kill anyone.

Tr. 1643. Shortly after, counsel again argued for the instruction:

> [T]he question is whether the evidence supports the lesser included. It's not an elements test. It's an evidence test. And we look to what has been presented, not the elements of the crime. And where the facts indicate a lesser, even though the facts may also indicate the greater, the Court

> is obligated to give the lesser and the Court's refusal to do that, it's a
> due process violation and it will diminish the reliability of the verdict.

*Id*. at 1654. Both times, the court summarily refused to give the instruction. *Id*. at
1644, 1656.

Trial counsel attempted to nonetheless convince the jury in closing arguments
that the crime did not rise to a conviction for murder committed with malice
aforethought. *See* Tr. 1687 ("And as they are kicking in the door, someone is
shooting simultaneously without a doubt recklessly."); *id*. at 1703 ("Kicking in a
door and shooting is reckless. Depraved mind."). However, with the instruction
denied, the jury chose between the dual options of complete acquittal or first-degree
malice aforethought murder.

In denying Mr. Fuston's claim that the instruction denial violated federal due
process, OCCA found that:

> The evidence showed that [Mr. Fuston] was recruited by fellow gang
> members to find Brittany Dillard and kill her. He drove from Enid to
> Oklahoma City where he met with Jordan and others to formulate a plan
> to achieve that end. Appellant and his accomplices went to Dillard's
> home. Appellant kicked in the front door with the intention of shooting
> to kill Dillard and anyone else inside that house. The decedent just so
> happened to be sitting on the couch near the front door. Appellant fired
> at least five (5) times from close range, striking the decedent three (3)
> times in the chest, shoulder and leg. Appellant's statements, made after
> the fact that he shot the decedent not twice but four (4) times because
> he moved, shows this was more than merely firing into a crowd. Far
> from showing second degree murder, Appellant's actions show his
> premeditated intent to kill anyone behind that front door. Premeditation
> sufficient to constitute first degree murder may be formed in an instant,
> or it may be formed instantaneously as the killing is being committed.

17

It may be inferred from the fact of the killing, unless circumstances raise a reasonable doubt whether such design existed.

A review of the record shows Appellant did not present any evidence, nor did the State's case provide any, that showed he engaged in imminently dangerous conduct in extreme disregard for human life without the intent of taking the decedent's life. The evidence clearly supports a finding that when Appellant fired at the decedent, he did so with the intent to kill. Therefore, we must conclude that the evidence would not have permitted a rational jury to find Appellant guilty of second degree depraved mind murder. Therefore, we find that the trial court properly refused Appellant's requested instruction.

At the same time, we conclude that the evidence would not have permitted a rational jury to acquit Appellant of the charged offense of first degree murder. The medical examiner's testimony, corroborated by photographs, showed the decedent was shot at close range, as he sat on his couch. Butler testified that Appellant admitted shooting the decedent and that Jordan had told him they were supposed to kill everyone in the house. No reasonable view of the evidence would permit a rational jury to acquit Appellant of first degree murder.

Since Appellant has not shown that the evidence presented at trial would permit a rational jury to find him guilty of second degree depraved mind murder and acquit him of first degree murder we find the trial court did not violate Appellant's federal due process rights under *Beck*. This proposition is denied.

*Fuston*, 470 P.3d at 325.

OCCA did not address the evidence that could have formed the basis for a lesser included offense. The State's uncontroverted evidence, however, showed the front door of the Rhodes' home was kicked open with shots fired into the house "almost simultaneously." Tr. 953. The State did not present evidence or allege that there was any way of knowing that Mr. Rhodes was on the couch directly inside, or that Dillard—or anyone else—was thought to be in that spot or in the home's living room at all. Thus, without knowing who, if anyone, would be found behind the door,

18

the State's own theory had Mr. Fuston firing across the threshold just as he or someone else kicked in the door.

The State's key witness, informant Brian Butler, had also testified that he and Mr. Fuston headed down from Enid in response to a phone call that mentioned only a fight that had happened, Tr. 1024, 1026; that, after other Oklahoma City stops, the group was on their way to Dillard's home "for another fight," *id*. at 1040-41; and that another participant, not Mr. Fuston, was the only person to mention any intention to kill after the shooting, *id*. at 1048-49. The entirety of the State's evidence of the lead-up to the crime also demonstrated Mr. Fuston had been entirely uninvolved and was unknown to Dillard.

### 2. The District Court Erroneously Upheld OCCA's Unreasonable Application of *Beck*.

Finding OCCA's decision entitled to AEDPA deference, the district court held that:

> The OCCA did not limit its analysis of Petitioner's *Beck* claim to the sufficiency of the evidence supporting the first degree murder conviction. Instead, having specified that second degree depraved mind murder is only applicable when there is an imminently dangerous act perpetrated "without any premeditated design to effect the death of any particular individual," *id*. (citing Okla. Stat. tit. 21, § 701.8(1)), the OCCA continued its review of the record to determine whether there was evidence showing Petitioner acted without the intent of taking the decedent's life. The OCCA then determined there was none. *Id*.

ROA I at 1962-63. The district court concluded that OCCA's opinion distinguished it from those at issue in *Phillips v. Workman*, 604 F.3d 1202, 1213-14 (10th Cir.

19

2010) and *Williams v. Trammell*, 539 F. App'x 844, 850-51 (10th Cir. 2013), where this Court found OCCA's *Beck* adjudications contrary to federal law § 2254(d)(1). *See* ROA I at 1963-64. But examination of those cases, and others in which this Court has found the § 2254(d)(1) exception to AEDPA deference to apply, reveals them as indistinguishable from the state-court decision at issue here.

The district court erred in finding that OCCA "reviewed the record to determine whether there was evidence showing Petitioner acted without the intent of taking the decedent's life" and that its decision was therefore a reasonable application of *Beck*. ROA I at 1962-63. Instead, OCCA's decision does not meaningfully differ from those found disentitled to AEDPA deference in *Phillips*, *Williams*, and this Court's other *Beck* precedents.

### a. OCCA Continues a History of Problematic *Beck* Adjudications.

The district court erroneously found that OCCA did not adjudicate Mr. Fuston's *Beck* claim in the same manner that it had done in two cases where this Court had reversed, citing to those cases:

> *Williams v. Trammell*, 539 F. App'x 844, 853 (10th Cir. 2013) ("[A]n instruction on [second degree depraved mind murder] demands evidence that the defendant did not intend to kill the victim." (internal quotation marks omitted)). *Cf. Williams*, 539 F. App'x at 850-51 (determining the OCCA did not properly apply *Beck* when it ruled that an instruction on second degree murder was not warranted *because* the evidence supported the conviction of first degree murder, without addressing whether there was evidence that would support a second degree murder instruction); *Phillips v. Workman*, 604 F.3d 1202, 1213-

> 14 (10th Cir. 2010) (under de novo review, citing to specific facts that
> supported a finding of lack of intent).

ROA I at 1963-64 (emphasis in original).[10] But a review of this Court's *Beck*

decisions places OCCA's adjudication of Mr. Fuston's claim as another in a long

line of misapplying the law. As it did here, OCCA has repeatedly denied that a due

process violation can stem from a trial court's refusal to grant instruction on a lesser

included offense, as long as there is evidence of first-degree murder. Across these

adjudications, OCCA has contravened *Beck* by—either explicitly or by omission—

examining only the first-degree murder evidence, rather than following the law by

also examining evidence that could support a lesser included offense conviction.

    *Phillips* and *Williams* built on earlier cases where this Court had found

OCCA's adjudications—with reasoning echoing that used here—erroneous or

contrary to *Beck*.[11] First, this Court examined an OCCA opinion in a case with a

---

[10] This Court in *Phillips* conducted the "de novo review" that the district court refers to only after finding that OCCA's *Beck* application did not warrant § 2254(d) deference. *Phillips*, 604 F.3d at 1213.

[11] That this Court ruled under the "contrary to" provision in some of these holdings does not render the "unreasonable application" provision inapplicable, as demonstrated in this Court's other *Beck* jurisprudence discussed later in this section. *See Richie v. Workman*, 599 F.3d 1131, 1137 (10th Cir. 2010) (after finding it "hardly certain that the OCCA failed to apply the correct federal law" as Petitioner asserted, despite OCCA's inclusion of abuse-of-discretion standard, holding instead "that the OCCA unreasonably applied *Beck* in affirming the denial of Mr. Richie's requested second-degree-murder instruction" where "[c]onsiderable evidence at trial could create doubt" as to intentionality). *See also Campbell v. Coyle*, 260 F.3d 531, 543 (6th Cir. 2001) ("This statement of the rule regarding a lesser-included offense instruction under the Eighth Amendment is indistinguishable from the holding of

complicated posture unlike Mr. Fuston's. *See Hooks v. Ward*, 184 F.3d 1206, 1230, 1230 n.17, 1235 (10th Cir. 1999) (where OCCA had not considered *Beck* claim on the merits, "not[ing] the relevance of its decision on [] a claim under state law [] that neither requested lesser included offense instruction was supported by the evidence"; discussing the felony-murder second degree instruction requested at trial but not raised in habeas appeal; and holding failure to request a second-degree depraved mind murder instruction prevented *Beck* relief).

Though these procedural issues precluded relief, the Court nonetheless found that Mr. Hooks rebutted the presumption of correctness afforded under 28 U.S.C. § 2254(e)(1) to the "mixed [conclusion] of fact and Oklahoma state law" OCCA had reached to reject the state-law analogue. *Hooks*, 184 F.3d at 1231. The Court at length outlined the evidence supporting the possibility that Mr. Hooks intended to beat the victim into miscarrying rather than kill her, *id*. at 1231-32, before finding OCCA "erroneously concluded that the evidence admitted at trial was insufficient to raise a reasonable doubt as to Hooks' intent to kill." *Id*. at 1233. And in *Mitchell v. Gibson*, 262 F.3d 1036, 1050-51 (10th Cir. 2001), this Court also ultimately left

---

*Beck* and its progeny. We must therefore determine whether the state court's application of this rule to these facts was objectively unreasonable.").

OCCA correctly recited *Beck*'s rule in adjudicating Mr. Fuston's claim, but unreasonably applied "this rule to these facts" after excluding analysis of the evidence that would have supported a second-degree murder instruction. This is in keeping with an "unreasonable application" of *Beck* per § 2254(d)(1). *See Williams v. Taylor*, 529 U.S. 362, 407 (2000).

the conviction intact, but first found "the state court ruling does not bar the grant of habeas relief" where OCCA relied on state law to find Mr. Mitchell's testimony proclaiming his innocence precluded a second-degree murder instruction—ignoring evidence also before the jury of an interrogation video in which the defendant contradicted his innocence defense to so hold.

In *Hogan v. Gibson*, 197 F.3d 1297, 1305 (10th Cir. 1999), quoting *Hogan v. State*, 877 P.2d 1157, 1160 (Okla. Crim. App. 1994), this Court found that OCCA's conclusion of "'sufficient evidence" to support a finding of premeditation in the trial record," had taken the place of the analysis required by *Beck*. The Court further held that OCCA had "*never* engag[ed] in the correct inquiry as to whether Hogan presented sufficient evidence to warrant a first-degree manslaughter instruction." *Hogan*, 197 F.3d at 1306 (emphasis in original). Thus, there was no *Beck* adjudication to which this Court could defer: "[B]ecause the Oklahoma Court of Criminal Appeals made no findings as to whether Hogan had presented sufficient evidence to warrant a first-degree manslaughter instruction, it is axiomatic that there are no findings to which we can give deference. As such, we will consider Hogan's *Beck* claim on the merits." *Hogan*, 197 F.3d at 1306. Similarly, in *Darks v. Mullin*, 327 F.3d 1001, 1009 (10th Cir. 2003) (quoting *Darks v. State*, 954 P.2d 152, 161 (Okla. Crim. App. 1998), this Court addressed an opinion in which OCCA had cited the evidence of premeditation and concluded, "As such, the trial court properly did

not instruct on First Degree Manslaughter." The *Darks* Court again found that "OCCA did not address the proper question and adjudicate whether there was sufficient evidence to warrant a manslaughter instruction," disentitling its decision to AEDPA deference. 327 F.3d at 1010.

OCCA soon repeated the same flawed analysis, leaving this Court to conclude in *Phillips v. Workman* that the state court's "assessment of the lack of evidence supporting a second-degree murder instruction appears to be based largely on its view that the evidence *did* support Mr. Phillips's conviction for first-degree malice aforethought murder." 604 F.3d 1202, 1212 (10th Cir. 2010) (emphasis in original). OCCA had explicitly relied on its first-degree murder evidence sufficiency adjudication to also resolve the *Beck* claim: "As discussed in Proposition I, we find the evidence showed Appellant acted with the specific intent to effect the death of the victim. Therefore, the evidence does not support the giving of a jury instruction on second degree depraved mind murder." *Phillips v. State*, 989 P.2d 1017, 1035 (Okla. Crim. App. 1999). This Court quoted OCCA's opinion on both claims and held, "In our view, by limiting its analysis of Mr. Phillips's *Beck* claim to the sufficiency of the evidence supporting the first-degree murder conviction, the OCCA's reasoning turns *Beck* on its head." *Phillips*, 604 F.3d at 1212.

Then, in *Williams v. Trammell*, 539 F. App'x 844 (10th Cir. 2013) (unpublished),[12] this Court again confronted an opinion where OCCA had detailed the trial evidence supporting a finding of premeditated intent and found, "This evidence is sufficient for any rational trier of fact to find Appellant acted with the premeditated intent to kill the deceased. . . .The evidence clearly supports a finding that when Appellant stabbed the deceased, he did so with the intent to kill her[]. Accordingly, instructions on second degree depraved mind murder were not warranted, as that crime was not supported by the evidence." *Williams v. State*, 22 P.3d 702, 712 (Okla. Crim. App. 2001). This Court explained that it did not pass AEDPA muster where "[OCCA] ruled that the evidence did not support a second-degree murder conviction. But it offered no explanation *why* the evidence did not support such a conviction, except that the evidence supported the first-degree conviction." 539 F. App'x at 850 (emphasis in original).

And, although the Court found it "hardly certain that the OCCA failed to apply the correct federal law" in *Richie v. Workman*, 599 F.3d 1131, 1138 (10th Cir. 2010), after examining OCCA's use of an abuse-of-discretion standard in adjudicating the *Beck* claim, the Court then held that, "Even granting AEDPA deference to the OCCA's decision, we must reverse. We hold that the OCCA unreasonably applied

---

[12] Mr. Fuston cites *Williams*, and other unpublished opinions of this Court, for their persuasive value. 10th Cir. R. 32.1(A); *see also* 10th Cir. R. 32.1(C) (retroactive effect of Rule on opinions issued before 2007).

*Beck* in affirming the denial of Mr. Richie's requested second-degree-murder instruction." *Id*. Where the victim died in an abandoned house following Mr. Richie's robbing, kidnapping, and bounding her by her neck to a closet pole, the Court determined "[c]onsiderable evidence at trial could create doubt that Mr. Richie intended to kill Mrs. Launhardt by strangling her with the ligature around her neck" given the controverted timing of her death. *Id*.[13] And in also rejecting the State's alternative argument that Mr. Richie intended the victim's death based on the conditions in which he left her, the Court emphasized, "Although the state's alternative theory of first-degree murder is a plausible one, the state must show more than plausibility to prevail on the lesser-included-offense issue." *Id*. at 1140-41.

This Court has also twice declined to defer to OCCA's decision and granted *Beck* relief in cases of defective second-degree instructions. In one, a flawed second-degree instruction told the jury it could "not" convict for second-degree murder. *Turrentine v. State*, 965 P.2d 967, 968 (Okla. Crim. App. 1998). After finding it owed no deference to OCCA's harmless error holding using the wrong standard, *Turrentine v. Mullin*, 390 F.3d 1181, 1190 (10th Cir. 2004), this Court then found

---

[13] In *Richie*, the timing of death was contested by the defense, who hired a forensic expert to prove the victim died after the defendant left her; though the State's expert testified the death occurred much earlier, "the jury was not required to believe [the State's expert] over [the defense expert]." 599 F.3d at 1139. In Mr. Fuston's case, the jury had no such issue of battling experts; the State's evidence of the shooting's mechanics was uncontested.

OCCA's underlying conclusion that the jury's first-degree murder conviction meant "they did not need to consider the charge of second degree murder and the accompanying instructions" was "inconsistent with the logic of the Supreme Court cases requiring a lesser offense instruction in cases where the facts so warrant." *Id*. at 1192-93.

And in *Taylor v. Workman*, 554 F.3d 879, 886 (10th Cir. 2009), the Court examined a case where the second-degree murder instruction mistakenly specified a lack of intent to either kill or harm. The Court found that OCCA's harmless error analysis again ran contrary to law and therefore merited no deference, pointing to the erroneous underlying *Beck* inquiry: "The OCCA erred by assuming that if the evidence 'suggested' a finding of first degree murder, it 'therefore' did not 'support a second degree murder instruction.'" *Taylor*, 554 F.3d at 887 (quoting *Taylor v. State*, 998 P.2d 1225, 1231 (Okla. Crim. App. 2000)).

OCCA continued its history of erroneous and unreasonable *Beck* adjudications in Mr. Fuston's case. Given the evidence discussed below that would have allowed a rational juror to acquit Mr. Fuston of first-degree murder and convict him of second-degree murder, OCCA unreasonably applied *Beck* to hold otherwise. Though the opinion—perhaps mindful of these myriad failures to issue a *Beck* holding entitled to AEDPA deference—pays lip service to the needed *Beck* language and alleges review of evidence to support a second-degree murder instruction, there

27

is no indication OCCA actually did anything other than proceed based on the evidence of premeditation, just as this Court has repeatedly found.

**b. OCCA's Adjudication Falls Under § 2254(d)(1). Under a Reasonable *Beck* Application, Mr. Fuston Was Entitled to a Second-Degree Murder Instruction.**

Here, each part of OCCA's opinion demonstrates that the court resumed its previous failures to conform to *Beck*. First, OCCA listed what "[t]he evidence showed" across seven sentences offered to support the first-degree murder conviction:

> The evidence showed that [Mr. Fuston] was recruited by fellow gang members to find Brittany Dillard and kill her. He drove from Enid to Oklahoma City where he met with Jordan and others to formulate a plan to achieve that end. Appellant and his accomplices went to Dillard's home. Appellant kicked in the front door[14] with the intention of shooting to kill Dillard and anyone else inside that house. The decedent just so happened to be sitting on the couch near the front door. Appellant fired at least five (5) times from close range, striking the decedent three (3) times in the chest, shoulder and leg. Appellant's statements, made after the fact that he shot the decedent not twice but four (4) times because he moved, shows this was more than merely firing into a crowd.

OCCA then summarized the foregoing: "Far from showing second degree murder, Appellant's actions show his premeditated intent to kill anyone behind that front

---

[14] As put forth in the Statement of Facts, the State actually could not establish whether Mr. Fuston or another of the three people who approached Mr. Rhodes' home was the person who kicked in the door. *See* Tr. 628, 824, 927-28, 1000.

door." *Fuston*, 470 P.3d at 325. OCCA went on to define the element distinguishing first-degree murder from depraved mind second-degree murder:

> Premeditation sufficient to constitute first degree murder may be formed in an instant, or it may be formed instantaneously as the killing is being committed. It may be inferred from the fact of the killing, unless circumstances raise a reasonable doubt whether such design existed.

*Id*. OCCA followed with a lone, cursory reference to reviewing the record for evidence of second-degree murder: "A review of the record shows Appellant did not present any evidence, nor did the State's case provide any, that showed he engaged in imminently dangerous conduct in extreme disregard for human life without the intent of taking the decedent's life." *Id*.

OCCA immediately switched back to a first-degree murder framework, deploying the same causal language denying a second-degree murder instruction could apply *because* the evidence supported a finding of intent that this Court has repeatedly found unacceptable:

> The evidence clearly supports a finding that when Appellant fired at the decedent, he did so with the intent to kill. **Therefore**, we must conclude that the evidence would not have permitted a rational jury to find Appellant guilty of second degree depraved mind murder. **Therefore**, we find that the trial court properly refused Appellant's requested instruction.

*Id*. (emphases added). Finally, OCCA again purported to marshal the evidence that could support a first-degree murder conviction, concluding with another recitation of the governing law:

At the same time, we conclude that the evidence would not have permitted a rational jury to acquit Appellant of the charged offense of first degree murder. The medical examiner's testimony, corroborated by photographs, showed the decedent was shot at close range, as he sat on his couch. Butler testified that Appellant admitted shooting the decedent and that Jordan had told him they were supposed to kill everyone in the house. No reasonable view of the evidence would permit a rational jury to acquit Appellant of first degree murder.

Since Appellant has not shown that the evidence presented at trial would permit a rational jury to find him guilty of second degree depraved mind murder and acquit him of first degree murder we find the trial court did not violate Appellant's federal due process rights under *Beck*. This proposition is denied.

*Id*. at 325-26.

The district court's holding that "OCCA did not limit its analysis of Petitioner's *Beck* claim to the sufficiency of the evidence supporting the first degree murder conviction," ROA I at 1962, is belied by OCCA's opinion. Nothing in the opinion demonstrated that OCCA did anything more than recite the necessary language, which does not suffice to make its adjudication a reasonable *Beck* application, as this Court has found.

In providing the background law and standards, OCCA had explained earlier in its adjudication that

Appellant was entitled to an instruction on second degree depraved mind murder if *prima facie* evidence of the offense was presented at trial. *Prima facie* evidence of a lesser included offense is that evidence which would allow a jury rationally to find the accused guilty of the lesser offense and acquit him of the greater. []Murder in the second degree occurs [w]hen perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life,

> although without any premeditated design to effect the death of any
> particular individual.

*Fuston*, 470 P.3d at 325 (internal citations and quotation marks omitted). Though

OCCA claimed to review the trial record for depraved mind evidence, the opinion's

content shows otherwise by ignoring factual interpretations with alternative support

for either a premeditated or depraved, imminently dangerous act while altogether

omitting facts supporting a lack of premeditation.[15]

Deconstructing OCCA's adjudication makes clear how the court

unreasonably applied *Beck* to the trial evidence. First, OCCA's references to the

events preceding the murder, and what had brought Mr. Fuston to Oklahoma City,

*Fuston*, 470 P.3d at 325, omitted Butler's repeatedly testifying to the plan to

"fight"—not kill—Dillard. Tr. 1023-24, 1040-41. Second, OCCA stated that the

front door was kicked in and that Mr. Rhodes "just so happened to be sitting on the

couch near the front door," *Fuston*, 470 P.3d at 325, while omitting the law

enforcement testimony that the kicking and shooting occurred simultaneously, Tr.

953, and the inference of recklessness this could give rise to, as well as the inference

of reckless shooting and unintentional death resulting from a victim tragically "just

so happen[ing]" to be in the path of bullets.

---

[15] OCCA thus also relied on unreasonable determinations of fact to adjudicate Mr.
Fuston's *Beck* claim, as put forth *infra*, I(C)(3).

Next, OCCA found that Mr. Rhodes was shot three times: in the chest, shoulder, and leg, later referring to medical examiner testimony that he was shot at close range as he sat on the couch. *Fuston*, 470 P.3d at 325. The trial testimony actually shows that the medical examiner, Dr. Chai Choi, could not pin down the number of bullet wounds he sustained:

> Q. Were you able to actually in looking physically at the body of Michael Rhodes, were you able to determine how many times he had actually been shot?
> A. Through the examination, clothing suspicious about that. Two or three. One, maybe two but you know, three and four and five holes in the clothing.
> Q. So there were a total of six different holes; is that correct?
> A. One, two, three, four, five -- could have been six, yes.
> Q. And can those holes sometimes be associated with entrance and then an exit wound?
> A. Yes. One or the other.

Tr. 1364-65. Dr. Choi further testified that she "found three separate wounds and [] indicated shoulder, leg and foot." Tr. 1373. She did not testify that Mr. Fuston shot Mr. Rhodes in the chest as OCCA stated, but rather, charted the fatal trajectory of the shot to Mr. Rhodes' shoulder through his chest. *Id*. at 1379 ("That is a fatal shot which is the path through the -- here, left shoulder going into the chest and cavity which is through the second rib broken and get into lung."). Thus, after someone kicked a door open at the same time Mr. Fuston fired a gun across the threshold multiple times, one of those shots happened to fatally hit a person, previously unknown to be on the other side of the door, who "happened to be" inside. Though

OCCA found that Mr. Fuston had shot five times, *Fuston*, 470 P.3d at 325, the court ignored this fact's potential inference of reckless, imprecise firing, considering that two bullets missed entirely and two did not make contact anywhere near vital organs. Depravity, rather than intent to kill, driving the shooting could also have been a potential inference drawn from law enforcement testimony to the bullet defects found scattered around the crime scene, *see* Tr. 882-84, 895, 947-48, also omitted from OCCA's opinion.

Finally, OCCA refers to Butler's account of Mr. Fuston's statement after the shooting that he fired multiple times because he saw movement, and Atiana Jordan's statement after that "they were supposed to kill everyone in the house." The former is another example of OCCA ignoring a factual interpretation that could support a lack of intent to kill and lesser included offense instruction: unexpected movement could have startled Mr. Fuston into firing multiple times, or it could have unfortunately placed Mr. Rhodes directly in the bullets' path, as trial counsel argued in asking for the instruction. *See* Tr. 1643 ("[B]ut for the fact that the homeowner was getting up the shots would have hit the fireplace and not him."). And the latter could have been interpreted by a rational jury as a glaring, and telling, omission: the only post-shooting statement of a supposed intent to kill came not from Mr. Fuston, but another party.

Thus, as in *Richie*, 599 F.3d at 1131, this Court should find OCCA "unreasonably applied *Beck* in affirming the denial of [Mr. Fuston's] requested second-degree-murder instruction" given the "[c]onsiderable evidence at trial" to support depraved-mind murder. The evidence supporting the "alternative theor[y]" of a design to effect death—however strong it may be—does not foreclose a second-degree murder instruction under a reasonable *Beck* analysis, as "*Beck* requires that where the evidence supports such alternative theories, the jury be presented the option to choose between them, and not only to choose between a capital conviction and acquittal." *Hogan*, 197 F.3d at 1312; *see also Richie*, 599 F.3d at 1140-41 ("[T]he state must show more than plausibility to prevail on the lesser-included-offense issue."); *Phillips*, 604 F.3d at 1216 ("[A]lthough the State's case for first-degree murder was plausible, the jury did not have to believe it").

OCCA unreasonably applied *Beck* despite its lip service to reviewing the record; the adjudication in total demonstrates it once again used logically fallacious reasoning to find a second-degree murder instruction cannot co-exist with evidence sufficient for a first-degree murder conviction. *Cf. Hooks*, 184 F.3d at 1232-33 (noting the "inverted logic" of State's argument that no lesser included murder instruction required because lesser included offenses require no intent to kill). OCCA did not render such judgment reasonable by simply discounting pieces of evidence, as this Court found OCCA had done in *Mitchell*, 262 F.3d at 1050, by

"refus[ing] to take into account the videotaped interview that was presented to the jury and in which Mr. Mitchell admitted to various degrees of involvement in the crime." There, as here, OCCA did not *explicitly* discount or refuse to take any evidence into account. *See Mitchell v. State*, 884 P.2d 1186, 1200-1201 (Okla. Crim App. 1994). But this Court nevertheless found § 2254(d)(1)'s "demanding" standard met. *Mitchell*, 262 F.3d at 1050 (concluding that, "[f]airly read, the state court opinion appears to hold" petitioner's assertion of innocence trumped lesser included instruction request under state law, despite evidence contradicting innocence defense).

But, unlike the *Mitchell* Court ultimately decided upon de novo review, *see infra*, I(C)(2)(c), here, ample evidence could support a second-degree murder conviction, rendering Mr. Fuston's right to due process violated by the denied instruction. "The key, undisputed circumstances of the homicide," *Hogan*, 197 F.3d at 1311, involved shots fired across a threshold as the door was kicked open, without any evidence of knowledge that the victim, or anyone, was inside. *Cf. Simpson v. Carpenter*, 912 F.3d 542, 598 (10th Cir. 2018) (in denying claim trial counsel ineffective for failing to request lesser included offense instruction, noting that defendant fired shots "knowing that three people were in the targeted car"). Indeed, if Mr. Fuston "had wanted to kill [Dillard], he could have [entered the home to find her after the door was kicked in]." *Richie*, 599 F.3d at 1138 (reasoning that

availability of, but failure to utilize, plan certain to effect death is pertinent consideration). Further, "[Mr. Fuston's] confession [to Butler], the central facet of the case against him," *Hogan*, 197 F.3d at 1309, contained multiple details that a rational jury could have found to be evidence of second-degree, not first-degree, murder, such as the group heading to the victim's home for "another fight," Tr. 1040-41, and his attributing the only statement regarding intent to kill to another participant, not Mr. Fuston. *Id*. at 1048-49.

Similarly, Butler's testimony that Mr. Fuston said he had shot multiple times because he saw someone moving, *id*. at 328, could have been interpreted by a rational jury not as evidence of intent to kill, but of a reflexive, startled lack of premeditation. *Cf. United States v. Hicks*, 116 F.4th 1109, 1114 (10th Cir. 2024) (internal citation and quotation marks omitted) (testimony "most favorable to the defendant" is accepted in context of self-defense instruction, including giving "full credence" to testimony that might be contradicted by other evidence). Affording "full credence" to Mr. Butler's testimony—which was not contradicted by other evidence, only by another potential inference—a lesser included offense instruction would have allowed the jury to interpret Mr. Fuston shooting multiple times after seeing movement as evidence of second degree murder. In *Taylor*, for instance, this Court granted *Beck* relief based in part on the petitioner's testimony that he shot the

victim multiple times after seeing movement from the corner of his eye in an apartment he was running through. *Taylor*, 554 F.3d at 890-91.

With a second-degree murder instruction, a jury could have provided the same favorable interpretation to Mr. Fuston shooting multiple times after a door was kicked open because he saw someone move. Indeed, the *Taylor* Court made this finding despite "recogniz[ing] the force" of the State's contrary expert evidence to support that the path of the multiple shots showed intentionality. 554 F.3d at 892 ("While this may have been a legitimate argument for the prosecutor to make to the jury, however, it is not so self-evident a proposition as to compel the jury to disbelieve Mr. Taylor's testimony."). The *Phillips* Court similarly found that, even recognizing the force of facts supporting intent to kill, in a crime involving stabbing the victim in the heart and uttering a racial slur over his dying body, 604 F.3d at 1205-1207, a second degree murder instruction should have been given because the jury might nonetheless have believed that the defendant had intended to harm, but not kill, the victim. *Id*. at 1216. And this Court has previously found the district court below to be "unreasonable" in proceeding the same way that OCCA did here. *Hogan*, 197 F.3d at 1310 ("[T]he ambiguity of the [evidence] permit[s] reasonable inferences of both first-degree murder and first-degree manslaughter. It is unreasonable to recognize the confession for only one of these possible inferences: that Hogan . . . acted with malice and intent to kill."). Thus, when "viewed *as a*

*whole*," as mandated by *Beck* and as OCCA failed to do, the evidence from Mr. Fuston's trial "warranted the giving of the lesser included offense instructions [Mr. Fuston] requested." *Mitchell*, 262 F.3d at 1050 (emphasis added).

The trial court's denial of a second-degree murder instruction in this case represents the "extreme malfunction[] in the state criminal justice system[]" that "habeas corpus is a guard against." *Richter*, 562 U.S. at 102. That much is clear from the survey of this Court's *Beck* jurisprudence above, as well as from a sampling of the Oklahoma capital cases that *did* receive instructions on a lesser included offense. *See*, *e.g.*, *Martinez v. State*, 371 P.3d 1100, 1116, 1119 (Okla. Crim. App. 2016) (second-degree murder instruction with "marginal chances of success" given in case with no voluntary intoxication instruction involving forty-minute fatal beatings and sexual assault); *Taylor*, 998 P.2d at 1228-29 (second-degree murder with scrivener's error given where defendant shot and killed victim he did not know, amid otherwise non-fatal shooting spree where he shot in the mouth friend who owed him money, shot in the head the friend's daughter after telling her, "I hope you die," and shot another woman twice, including second shot while she lay on ground); *Turrentine*, 965 P.2d at 969 (in another case with no voluntary intoxication instruction, second-degree murder instruction with scrivener's error given for the murders of defendant's girlfriend's children, committed after he procured gun from his ex-wife, told her "things [are] coming to a head," and killed his sister and his girlfriend); *Black v.*

*State*, 21 P.3d 1047, 1069-70 (Okla. Crim. App. 2001) (first-degree manslaughter instruction given in case where, in fight Mr. Black and his friends initiated, "it is difficult to believe Appellant did not intend to kill Lewis when he stabbed him some thirteen times with wounds to the head and chest in what was then a three on one fight").

State cases resulting in second-degree or other lesser murder convictions are also illuminating on this front. *See Taylor*, 554 F.3d at 891 ("The OCCA has upheld second degree depraved mind murder convictions in a variety of cases in which the facts were similar to these, or arguably even more suggestive of an intent to kill."); *id*. at 891-92 (collecting OCCA cases upholding second-degree murder convictions in cases involving: intentional stabbing after starting fight with victim; close range shooting after following victim to car; thirteen stab wounds to victim's chest and neck; and deliberate battering and dropping of infant); *Hogan*, 197 F.3d at 1309 ("The facts of this case strikingly resemble those of [*George*] *Williams* [*v. State*], 513 P.2d 335 [Okla. Crim. App. 1973], in which the Oklahoma Court of Criminal Appeals found that a first-degree manslaughter instruction was warranted."); *Frazier v. State*, 654 P.2d 639, 640 (Okla. Crim. App. 1982) (defendant with personal motive shot victim twice after going to car and returning with gun).

### c.    Mr. Fuston's Case Is Distinct from the Cases Where this Court Has Found no *Beck* Error.

The gulf between Mr. Fuston's case and those in which this Court did not reverse for *Beck* error further underscores both OCCA's unreasonable adjudication and the propriety of a second-degree murder instruction in this case. *See Phillips*, 604 F.3d at 1215-16 ("This case, like *Hogan*, *Taylor*, and *Turrentine*, stands in stark contrast to others in which this court and the OCCA concluded that a lesser-offense instruction was not needed, because in those cases, the evidence did not support the lesser-included offense."). This Court's applicable *Beck* jurisprudence in toto makes clear Mr. Fuston's entitlement to relief.

In four cases, this Court deferred to OCCA's adjudications of *Beck* claims or otherwise denied *Beck* relief where, unlike in Mr. Fuston's case, the record contained no evidence, or only disputed evidence, to support lack of intent. Three of these cases involved requested manslaughter instructions. *See Gilson v. Sirmons*, 520 F.3d 1196, 1237-38 (10th Cir. 2008)[16] (only evidence of the carelessness, rather than participation and intent to cause physical harm through child abuse, required for second-degree manslaughter was the internally inconsistent and physically contradicted testimony of victim's mother); *Darks*, 327 F.3d at 1010-11 (on de novo

---

[16] *Gilson* also involved a second-degree murder instruction request, but this Court found Oklahoma law precluded such instruction in the case of a child abuse murder. *See id*. at 1237.

review after § 2254(d) bar cleared, finding *Beck* relief unwarranted where no evidence to support adequate provocation element of heat-of-passion manslaughter, as attorney for petitioner conceded); *Hooker v. Mullin*, 293 F.3d 1232, 1239-40 (10th Cir. 2002)[17] (no *Beck* error in denied heat-of-passion manslaughter instruction where no evidence presented to show adequate provocation, sufficient rage, or lack of opportunity for passion to cool).

In *Robedeaux v. Gibson*, No. 98-6021, 1999 WL 672305, at *5-7 (10th Cir. July 8, 1999) (unpublished), Mr. Robedeaux argued that the jury could have found he unintentionally killed the victim during a domestic dispute, but "[t]he record is devoid of evidence that [the two] argued the night of [her murder]. There was no testimony regarding shouting or arguing from Robedeaux's apartment on the night of the murder." *Id*. at 7. Ultimately, this Court

> Agree[d] with the state court's conclusion that no evidence exists to support a second degree murder or first degree manslaughter instruction. Consequently, we find the state court's holding regarding petitioner's *Beck* claim was neither an unreasonable application of clearly established federal law, 28 U.S.C. § 2254(d)(1), nor 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding,' *see id*. § 2254(d)(2).

---

[17] Though OCCA also denied relief on a denied second-degree murder instruction request, *Hooker v. State*, 887 P.2d 1351, 1360-61, 1361 n.25 (Okla. Crim. App. 1994), only the denied manslaughter instruction was at issue before this Court. *Hooker*, 293 F.3d at 1239-40.

*Id*. Likewise, after finding that OCCA's decision did not warrant deference, this Court found on de novo review in *Mitchell*, 262 F.3d 1036, 1051, that no second-degree murder instruction had been warranted where "[n]othing in this evidence [of Mr. Mitchell's confession to participating in the beating death of a young woman] would allow a rational jury to find that Mr. Mitchell participated in the crime without the intent to kill. Moreover, we have carefully reviewed the entire trial transcript and have uncovered no other evidence that would support such a finding." This is in stark contrast with Mr. Fuston's case, where, as described in the previous subsection, a "careful[] review" of the trial transcript provides ample evidence overlooked by OCCA that "would allow a rational jury to find that Mr. [Fuston] participated in the crime without the intent to kill."

And in *Young v. State*, 12 P.3d 20, 38 (Okla. Crim. App. 2000), Mr. Young had requested several lesser included offense instructions. His *Beck* claim asserted that a jury could have believed either that he was not the co-defendant that fired his gun during the robbery, or that if he was, it was as he fled and in response to one of the robbery victims firing first. *Young v. Sirmons*, 486 F.3d 655, 672 (10th Cir. 2007). OCCA emphasized that it "disagree[d] with Appellant's description of the evidence" and that it could not "interpret the evidence" as urged to find that either manslaughter or second-degree murder instructions had been warranted, given the physical evidence singling out Mr. Young and showing that shots were not fired only

42

in fleeing. *Young*, 12 P.3d at 39. This Court similarly recounted the physical evidence contradicting the "theory that he fled without firing" and held that, "in light of the undisputed evidence that the shorter man [Young] engaged in the gun battle, we are foreclosed from concluding it was unreasonable for the OCCA to hold that a rational jury could not find Young's flight theory credible." *Young*, 486 F.3d at 672. Here, in contrast, Mr. Fuston does not advance any physical theory unsupported by the trial evidence.

The final type of inapposite case in which this Court has deferred to OCCA's *Beck* adjudications involve evidence of intent to kill that was undeniable, aside from purported, controverted evidence of intoxication or some other diminished mental state. In *Boyd v. Ward*, 179 F.3d 904, 917 (10th Cir. 1999),[18] the Court held that OCCA's determination that a certain piece of evidence "did not support the giving of [lesser included offense] instructions" "is not an unreasonable determination of the facts in light of the evidence presented" under § 2254(d)(2). In the opinion at issue, OCCA had found that neither manslaughter nor second-degree murder

---

[18] *Boyd* analyzed the claim assuming arguendo *Beck* applied, given Circuit law at the time. *Boyd*, 179 F.3d at 916. The claim also differed from Mr. Fuston's in that trial counsel failed to request lesser included offense instructions; the state-court claim alleged error in the trial court's failure to *sua sponte* instruct. *Boyd v. State*, 839 P.2d 1363, 1366 (Okla. Crim. App. 1992). This Court examined whether counsel was ineffective for failing to request the instructions. *Boyd*, 179 F.3d at 917. This Court had also not yet precluded a *Beck* claim in such circumstances. *See Hooks*, 184 F.3d at 1234 (holding such failure precluded *Beck* relief a month after *Boyd*).

instructions were warranted in Mr. Boyd's trial for killing a police officer with multiple shots, including one with the gun placed "against the chest," of the victim, to avoid apprehension after a robbery. *Boyd v. State*, 839 P.2d 1363, 1366 (Okla. Crim. App. 1992). The state court reached this conclusion after quoting and analyzing the testimony that Mr. Boyd relied on to show he did not have a design to effect death or premeditated intent due to self-reported blacking out during the act and found that the evidence was insufficient to support either. *See id*. at 1366-68. Here, again, Mr. Rhodes' fatal injury stands apart from one sustained due to a gun being placed against his chest, and the evidence and inferences that could have given rise to a second-degree murder conviction stand apart from a self-report of blacking out.

And in *Bryson v. Ward*, 187 F.3d 1193, 1198-99 (10th Cir. 1999), Mr. Bryson and his co-defendant beat the victim with baseball bats before setting him on fire in an attempt to make the murder look accidental; the victim's wife was romantically involved with Mr. Bryson and sought life insurance proceeds. This Court found "[t]he evidence overwhelmingly established that Bryson and [the victim's wife] plotted to kill the victim for approximately one month prior to the murder" and that evidence of intoxication the night before the murder did not impact the evidence of intent, given testimony on the short period of intoxication following crack cocaine

use and on Mr. Bryson's ability to describe the crime's details after. *Id*. at 1208.[19] Once again, the distinction between these facts and those of Mr. Fuston's case merits mention: not only was there no evidence of a plot to kill the victim, or Dillard, but the evidence OCCA omitted from its adjudication demonstrated a plan to engage in "another fight." Tr. 1040-41.

Then, in *Charm v. Mullin*, 37 F. App'x 475, 483 (10th Cir. 2002) (unpublished), this Court upheld as reasonable OCCA's finding of insufficient evidence to warrant instructing the jury in first-degree manslaughter, citing § 2254(d) generally. OCCA had found "the only arguable justification for a first degree manslaughter" instruction in the case, which involved the kidnapping, rape and bludgeoning to death with a sledgehammer of a 14-year-old girl, was voluntary intoxication, but that there was insufficient evidence of intoxication to raise a reasonable doubt as to Mr. Charm's specific intent to kill. *Charm v. State*, 924 P.2d 754, 761 (Okla. Crim. App. 1996). Similarly, in *Grissom v. Carpenter*, 902 F.3d 1265, 1290-91 (10th Cir. 2018), another case where trial counsel did not request a

---

[19] The Court did not categorize its ruling under § 2254(d)(1) or (d)(2), ruling instead that it "afford[ed] [OCCA's] factual determination a presumption of correctness under 28 U.S.C. § 2254(e)(1)" and concluding it "agree[d] that the evidence did not support instructions on either of these lesser included offenses." *Bryson*, 187 F.3d at 1207. This wrinkle might have owed to the question of whether *Beck* even applied following a change in state law, *see id.*, or to the pre-AEDPA OCCA opinion, which did not mention *Beck* or due process in adjudicating the claim, but rather referred only to state law. *See Bryson v. State*, 876 P.2d 240, 254-55 (Okla. Crim. App. 1994).

lesser included offense instruction, this Court denied that was ineffective where "there was simply no evidence from which the jury could have reasonably found that Grissom was so drunk that he was unable to form the intent to kill," *id*. at 1291, when he "chased [the victim] from the living room . . . into a bedroom and, despite her pleas for mercy, proceeded to shoot her not once, but twice in the head at close range." *Id*. at 1291-92.

Finally, in *Grant v. Trammell*, 727 F.3d 1006, 1014 (10th Cir. 2013), the Court found on novo review[20] that a rational jury could not have disagreed with OCCA's factual assessment that "the record lacked evidence [of] mental infirmities that rendered him incapable of forming an intent to kill, especially given that his own expert refused to say Mr. Grant couldn't understand right from wrong" where Mr. Grant had "forced [the victim] into the closet, covered her mouth, and stabbed her repeatedly near her vital organs." *See also id*. at 1010 (Mr. Grant had told victim he would "get [her]" the day before stabbing her sixteen times). The district court here pointed primarily to *Grant* in upholding OCCA's decision. *See* ROA I at 1963 (citing *Grant*, 727 F.3d at 1014 & 1015 n.3). But Mr. Fuston's claim is unlike Mr. Grant's: it does not rest on contested defense evidence of his mental state in attempting to

---

[20] The Court provided de novo review of the *Beck* claim "to afford Mr. Grant the benefit of the most generous standard of review we can," as Mr. Grant had not requested lesser included offense instructions at trial and the state-court claim was therefore on a different, state-law issue. *Grant*, 727 F.3d at 1013.

negate the State's evidence of intent to kill, *see Grant*, 727 F.3d at 1014-15, but rather, on the facts of depraved mind murder that OCCA either omitted from its adjudication or interpreted as only supporting a first-degree murder conviction. *See supra*, I(C)(2)(b). The *Grant* Court ultimately found:

> [W]ere we to consider the factual questions ourselves, without the layer of deference due under § 2254(e), we would reach the same view about them as the OCCA did. We simply cannot say that, given the facts in this record, a rational jury could have found that Mr. Grant acted "without any premeditated design" to kill Ms. Carter.

727 F.3d at 1014-15. "The facts in [Mr. Fuston's] record" dictate the opposite result, as explained. Instead, here, OCCA's decision is "so obviously wrong that no reasonable judge could arrive at the same conclusion given the facts of [Mr. Fuston's] case." *Meek v. Martin*, 74 F.4th 1223, 1248 (10th Cir. 2023) (internal citations and quotation marks omitted).

The decisions of this Court Mr. Fuston discusses above do not include the capital, state cases that this Court reviewed under 28 U.S.C. § 2254 as revised by AEDPA in which a *Beck* issue arose in the following inapplicable contexts: cases in which the trial court did instruct on a non-capital alternative verdict option, so the defendants' juries did not confront the all-or-nothing decision *Beck* guards against (*see Simpson v. Carpenter*, 912 F.3d 542 (10th Cir. 2018); *Eizember v. Trammell*, 803 F.3d 1129 (10th Cir. 2015); *Welch v. Workman*, 639 F.3d 980 (10th Cir. 2011); *Bland v. Sirmons*, 459 F.3d 999 (10th Cir. 2006); *Patton v. Mullin*, 425 F.3d 788

(10th Cir. 2005); *Spears v. Mullin*, 343 F.3d 1215 (10th Cir. 2003); *Willingham v. Mullin*, 296 F.3d 917, 920, 923-24 (10th Cir. 2002); *Valdez v. Ward*, 219 F.3d 1222 (10th Cir. 2000); *James v. Gibson*, 211 F.3d 543 (10th Cir. 2000); *Paxton v. Ward*, 199 F.3d 1197 (10th Cir. 1999)); cases in which the defendant did not request a lesser included instruction (*see Thornburg v. Mullin*, 422 F.3d 1113 (10th Cir. 2005); *Smith v. Gibson*, 197 F.3d 454 (10th Cir. 1999)); cases where state law did not support the requested alternative instruction as a lesser included offense (*see Fairchild v. Trammell*, 784 F.3d 702 (10th Cir. 2015); *Wilson v. Sirmons*, 536 F.3d 1064 (10th Cir. 2008); *Brown v. Sirmons*, 515 F.3d 1072 (10th Cir. 2008); *Malicoat v. Mullin*, 426 F.3d 1241 (10th Cir. 2005); *Fowler v. Ward*, 200 F.3d 1302, 1309 (10th Cir. 2000), *overruled on other grounds by Moore v. Marr*, 254 F.3d 1235, 1239 (10th Cir. 2001)); and a case where the defendant later took issue with the wording of his requested, and granted, manslaughter instruction (*Hogan v. Trammell*, 511 F. App'x 769, 774 (10th Cir. 2013) (unpublished)).

Discounting these cases, and those in inapposite postures (cases with habeas petitions filed before the AEDPA's passage; federal cases; noncapital cases; cases without a *Beck* claim but with an unrelated citation by this Court; and the cases in which this Court interpreted *Beck* as inapplicable to Oklahoma before reversing itself in *Hooks*, 184 F.3d at 1227), Mr. Fuston is aware of eighteen state capital cases where this Court analyzed OCCA's *Beck* adjudication under § 2254. In nine—*half*—

of those decisions, this Court found OCCA's decision not entitled to deference, going on to reverse six of those cases.

* * * *

This Court has repeatedly found that OCCA has not applied *Beck* within the parameters of § 2254(d)(1), and Mr. Fuston's case continues that pattern. "Fairminded jurists could [not] disagree on the correctness of the state court's decision," *Richter*, 562 U.S. at 101; OCCA instead here plainly lodged another in a long line of *Beck* adjudications that do not warrant this Court's deference. The State's evidence of the shooting's physical mechanics and of statements made before and after the crime, introduced via a law enforcement officer and the star informant witness, are sufficient for a rational jury to acquit Mr. Fuston of first-degree murder and convict him of second-degree murder. That Mr. Fuston's jury was denied this option "encourage[d] the jury to convict for an impermissible reason—its belief that [Mr. Fuston] is guilty of [the] serious crime [of killing Mr. Rhodes] and should be punished," *Beck*, 447 U.S. at 642, thereby "introduce[ing] a level of uncertainty and unreliability that cannot be tolerated in a capital case." *Id*. at 643.

### 3. The District Court Erroneously Upheld OCCA's Unreasonable Determination of Facts.

The district court's one-paragraph rejection of Mr. Fuston's § 2254(d)(2) argument was also in error. ROA I at 1964-65. The court reasoned, without explanation, that Mr. Fuston did not satisfy § 2254(d)(2) because he "takes issue

with the OCCA's analysis of and reliance upon the factual determinations, rather than with the determinations themselves." ROA I at 1964.

To the extent the court was implicitly adopting Respondent-Appellee's habeas argument[21] denying the application of § (d)(2) to this subclaim, *see* ROA I at 585-86, this Court has repeatedly noted that *Beck* does not neatly fall into either the factual or legal category. *See*, *e.g.*, *Darks*, 327 F.3d at 1010 n.6 ("We need not decide whether the sufficiency of the evidence to support this lesser included offense instruction is a factual or legal determination."); *Hogan*, 197 F.3d at 1306 ("[O]ur precedents have not been consistent in their treatment of whether a question of sufficiency of the evidence represents a legal conclusion or factual determination."). As such, this Court has repeatedly assessed *Beck* adjudications for unreasonable determinations of fact under § 2254(d)(2), as have courts in other jurisdictions. *See Boyd*, 179 F.3d at 917; *Robedeaux*, 1999 WL 672305 at *7; *Hall v. Thomas*, 977 F. Supp. 2d 1129, 1168 (S.D. Ala. 2013); *Capano v. Carroll*, 547 F. Supp. 2d 378, 390-91 (D. Del. 2008).

Except for *Gilson*, 520 F.3d at 1233, the cases Respondent-Appellee cited do not speak to the analysis of both fact and law that *Beck* claims inherently require.

---

[21] Respondent did not re-urge this argument in her Response to Mr. Fuston's request for a certificate of appealability. Resp. to Petr. Amend. Mot. for Certificate of Appealability at 43-46, *Fuston v. Quick*, No. 24-6166 (10th Cir. Mar. 26, 2025) (ECF page numbering).

*See* ROA I at 585-86. And Respondent-Appellee overread *Gilson*, which did not purport to determine binding Circuit precedent with a panel's election that was "by no means outcome-determinative." 520 F.3d at 1233.[22] *See also Williams*, 539 F. App'x at 848 (in opinion issued five years after *Gilson* that did not cite *Gilson*, applying § 2254(d)(1) rather than § (d)(2) because the petitioner "does not challenge the facts found by the OCCA," not because § (d)(2) is inapplicable to *Beck* claims).

Here, OCCA unreasonably determined the facts on its way to unreasonably applying the law. *See Williams v. Taylor*, 529 U.S. 362, 386 (2000) (§ 2254(d)(2) "provides relevant context for . . . interpretation of § 2254(d)(1) . . . .[F]ederal habeas courts must make as the starting point of their analysis the state courts' determinations of fact"). OCCA unreasonably determined that the crime facts supported only one possibility: that Mr. Fuston was intentionally shooting to kill, though it was the "wrong" person. But "even if the jury believed [Mr. Fuston] was intentionally seeking to harm" anyone inside by opening fire, a rational jury nonetheless could have "concluded [Mr. Fuston] had no intent to kill him." *Taylor*, 554 F.3d at 891. OCCA simply omitted the evidence supporting this conclusion, failing to account for the shooting occurring simultaneously with the door being kicked open, for repeated references to seeking a fight, and for the lack of evidence

---

[22] Indeed, Mr. Gilson had not raised a *Beck* argument under § 2254(d)(2). *See* Appellant's Opening Br. at 84-100, *Gilson v. Sirmons*, No. 06-6287, 2007 WL 2724126 (10th Cir. July 25, 2007).

that Mr. Fuston or any of the participants had any knowledge that Mr. Rhodes, his niece, or anyone else would be on the other side of the door.

Butler's testimony that Mr. Fuston said he shot multiple times because the person moved, *Fuston*, 470 P.3d at 328, could have been open to multiple interpretations, such as being startled by unexpected movement. Elsewhere, as also ignored by OCCA, Butler testified that Mr. Fuston and the other participants travelled to the victim's home "for another fight," with the victim's niece. Tr. 1040-41. Especially "given the centrality of" Butler's testimony to the case, "it is unreasonable to ignore it to the extent it supports an alternative inference[.]" *Hogan*, 197 F.3d at 1311. OCCA similarly ignored testimony from the medical examiner and law enforcement witnesses that could have inferred a depraved-mind shooting. Ignoring these central, "highly salient" facts—either by omitting them from the adjudication entirely or by ignoring their potential alternative interpretation—is paradigmatic of an unreasonable factual determination:

> [T]his Court has not hesitated to find AEDPA's standard satisfied when a state court's factfinding process disregards information that is highly relevant to a court's factual determination. *See, e.g.*, *Brumfield* [*v. Cain*, 576 U.S. [305], 314–316, 135 S.Ct. 2269 (2015); *Wiggins v. Smith*, 539 U.S. 510, 528, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); [*Miller-El v.*] *Dretke*, 545 U.S. [231], 265–266, 125 S.Ct. 2317 (2005); *see also* 2 R. Hertz & J. Liebman, Federal Habeas Corpus Practice and Procedure § 32.4, p. 2002, and n.12 (7th ed. 2023) (collecting lower court cases in which "[t]he state court ... overlooked or misconstrued evidence"). To be sure, "a state court need not make detailed findings addressing all the evidence before it." [*Miller-El v.*] *Cockrell*, 537 U.S. [322], 347, 123 S.Ct. 1029 (2003). But a state court's disregard for highly salient

facts casts serious doubt on the reasonableness of the state court's determination.

*King v. Emmons*, 144 S.Ct. 2501, 2504 (2024) (mem.) (Sotomayor, J., dissenting from denial of certiorari). Indeed, as the district court cited here in purporting to distinguish Mr. Fuston's case:

> *Williams v. Trammell*, 539 F. App'x 844, 853 (10th Cir. 2013) ("[A]n instruction on [second degree depraved mind murder] demands evidence that the defendant did not intend to kill the victim." (internal quotation marks omitted)). *Cf. Williams*, 539 F. App'x at 850-51 (determining the OCCA did not properly apply *Beck* when it ruled that an instruction on second degree murder was not warranted *because* the evidence supported the conviction of first degree murder, without addressing whether there was evidence that would support a second degree murder instruction); *Phillips v. Workman*, 604 F.3d 1202, 1213-14 (10th Cir. 2010) (under de novo review, citing to specific facts that supported a finding of lack of intent).

ROA I at 1963-64 (emphasis in original). But the evidence and facts that *Phillips* and *Williams* referenced, supporting second-degree murder instructions in those cases, are not absent from Mr. Fuston's case—they are only absent from OCCA's opinion, rendering it an unreasonable determination of facts. Ignoring the evidence that would have permitted Mr. Fuston's jury to find him guilty of second-degree murder does not render it nonexistent in the record.

The trial court deprived Mr. Fuston's jury of the alternative between acquittal and a capital conviction that the Constitution here required; OCCA based its adjudication on an unreasonable determination of the facts in which it ignored the pertinent evidence, or the pertinent alternative inferences; and the district court

summarily dismissed Mr. Fuston's resultant § 2254(d)(2) argument. This Court's

intervention is once again needed.

## CONCLUSION

Mr. Fuston respectfully requests this Court reverse the district court with

instructions to grant the Writ or to hold an evidentiary hearing.

## STATEMENT REGARDING ORAL ARGUMENT

Counsel requests oral argument pursuant to Federal Rule of Appellate

Procedure 34(a). Due to the complex legal and factual issues in this capital case, oral

argument will materially assist the Court in adjudicating these matters.

Respectfully submitted,

*s/ Callie Heller*

CALLIE HELLER, Texas Bar #24101897
Assistant Federal Public Defender
EMMA V. ROLLS, OBA #18820
First Assistant Federal Public Defender
Office of the Federal Public Defender
Western District of Oklahoma
215 Dean A. McGee Ave., Suite 707
Oklahoma City, OK 73102
(405) 609-5975 telephone
(405) 609-5976 facsimile
Callie_Heller@fd.org
Emma_Roll@fd.org

COUNSEL FOR PETITIONER/APPELLANT,
RONNIE EUGENE FUSTON

## <u>CERTIFICATE OF DIGITAL SUBMISSION</u>

I certify that with respect to the foregoing Appellant's Opening Brief that: (1) all required privacy redactions have been made pursuant 10th Cir. R. 25.5; (2) the hard copies submitted to the Court via ECF submission are exact copies of the version submitted electronically, and (3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Symantec Endpoint Protection, Version 14.000.15.105, updated daily, and according to the program, is free of viruses.

*s/ Callie Heller*
CALLIE HELLER, Texas Bar #24101897
Assistant Federal Public Defender

## <u>CERTIFICATE OF COMPLIANCE</u>

1. ***Petitioner-Appellant's Opening Brief*** complies with the type-volume limitation of Fed. R. App. P. 32(g) because this brief contains 13,824 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. ***Petitioner-Appellant's Opening Brief*** complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

Dated July 21, 2025.

*s/ Callie Heller*
CALLIE HELLER, Texas Bar #24101897
Assistant Federal Public Defender