Case No. 24-6166

_____

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

_____

**RONNIE EUGENE FUSTON,**
*Petitioner-Appellant,*

v.

**CHRISTE QUICK, Warden,**
*Respondent-Appellee.*

_____

**RESPONDENT/APPELLEE'S RESPONSE BRIEF**

_____

**On Appeal from the United States District Court
For the Western District of Oklahoma
(D.C. No. CIV-21-179-SLP)
The Honorable Scott L. Palk, United States District Judge**

_____

**GENTNER F. DRUMMOND
ATTORNEY GENERAL OF OKLAHOMA**

**MICHEL A. TRAPASSO, OBA #35298
ASSISTANT ATTORNEY GENERAL
313 NE 21st Street
Oklahoma City, OK   73105
(405) 521-3921 (Voice)/(405) 522-4534 (Fax)
Service email:   fhc.docket@oag.ok.gov
                        michel.trapasso@oag.ok.gov**

**ATTORNEYS FOR RESPONDENT/APPELLEE**

**September 19, 2025**                    **ORAL ARGUMENT IS REQUESTED**

BRIEF HAS ATTACHMENTS IN PDF FORMAT

## <u>TABLE OF CONTENTS</u>

Page

PRIOR OR RELATED APPEALS.................................................................. viii

ISSUES PRESENTED FOR REVIEW.............................................................2

STATEMENT OF THE CASE...........................................................................3

STATEMENT OF THE FACTS ........................................................................5

SUMMARY OF THE ARGUMENT .................................................................9

STANDARD OF REVIEW..............................................................................12

ARGUMENT AND AUTHORITY .................................................................17

<u>PROPOSITION</u>

PETITIONER'S CLAIM FAILS FOR A LACK OF CLEARLY
ESTABLISHED LAW. REGARDLESS THE OCCA'S DENIAL
OF PETITIONER'S *BECK* CLAIM WAS NOT CONTRARY TO,
OR AN UNREASONABLE APPLICATION OF, CLEARLY
ESTABLISHED FEDERAL LAW, NOR WAS IT BASED ON AN
UNREASONABLE DETERMINATION OF FACT ...............................17

A. Background underlying this claim ..............................................18

B. Petitioner's claim fails for a lack of clearly
established law.................................................................................22

C. The OCCA's decision was reasonable ........................................26

(1) The OCCA applied the proper *Beck* standard ...................26

(2) The evidence supports the OCCA's decision.......................31

(3) Conclusion.............................................................................47

D. The OCCA's decision was not based on an
unreasonable determination of fact..............................................47

**CONCLUSION**................................................................................**51**

**STATEMENT OF ORAL ARGUMENT**...........................................**51**

**CERTIFICATE OF COMPLIANCE** ................................................**52**

**CERTIFICATE OF SERVICE** ........................................................**52**

**CERTIFICATE OF DIGITAL SUBMISSION**.................................**53**

<u>**ATTACHMENTS**</u>

> Order, *Fuston v. Quick*,
> No. CIV-21-170-SLP, Western District of Oklahoma, July 12, 2024

## <u>TABLE OF AUTHORITIES</u>

### <u>FEDERAL CASES</u>

*Andrew v. White*,
  145 S. Ct. 75 (2025)...................................................................... 15, 16

*Beck v. Alabama*,
  447 U.S. 625 (1980) ................................... 2-5, 10, 17, 18, 20, 22-31, 33, 36-38, 40
  ........................................................................... 42, 44, 47, 48, 51

*Black v. Workman*,
  682 F.3d 880 (10th Cir. 2012) ..........................................................16

*Bonidy v. U.S. Postal Serv.*,
  790 F.3d 1121 (10th Cir. 2015) .........................................................26

*Bosse v. Oklahoma*,
  580 U.S. 1 (2016) ..........................................................................16

*Brown v. Davenport*,
  596 U.S. 118 (2022) .......................................................................49

*Brumfield v. Cain*,
  576 U.S. 305 (2015) ............................................................... 15, 48, 49

*Campbell v. Coyle*,
  260 F.3d 531 (6th Cir. 2001) ............................................. 37, 43, 44, 45

*Darks v. Mullin*,
  327 F.3d 1001 (10th Cir. 2003) ....................................... 11, 36, 37

*Dunn v. Madison*,
  583 U.S. 10 (2017) .........................................................................15

*Eizember v. Trammel*,
  803 F.3d 1129 (10th Cir. 2015) ................................................. 10, 30

*Frederick v. Quick*,
  79 F.4th 1090 (10th Cir. 2023).............................................. 12, 48-51

*Frost v. Pryor*,
  749 F.3d 1212 (10th Cir. 2014) .................................................. **14, 15**

*Gilbert v. Mullin*,
  302 F.3d 1166 (10th Cir. 2002) ...................................................**13**

*Gilson v. Sirmons*,
  520 F.3d 1196 (10th Cir. 2008) ...................................................**48**

*Goodwin v. Johnson*,
  632 F.3d 301 (6th Cir. 2011) .....................................................**43**

*Grant v. Royal*,
  886 F.3d 874 (10th Cir. 2018) ....................................................**27**

*Grant v. Trammel*,
  727 F.3d 1006 (10th Cir. 2013) .................................... **11, 16, 30, 38, 41**

*Grissom v. Carpenter*,
  902 F.3d 1265 (10th Cir. 2018) .................................... **33, 40, 50**

*Hancock v. Trammell*,
  798 F.3d 1002 (10th Cir. 2015) ................................... **27, 34**

*Harrington v. Richter*,
  562 U.S. 86 (2011) .................................................................**14**

*Hogan v. Gibson*,
  197 F.3d 1297 (10th Cir. 1999) ................................... **24, 27, 28**

*Hooks v. Ward*,
  184 F.3d 1206 (10th Cir. 1999) ................................... **24, 25**

*Hopkins v. Reeves*,
  524 U.S. 88 (1998) ............................................... **10, 25**

*Hopper v. Evans*,
  456 U.S. 605 (1982) ........................................... **24, 25, 44**

*House v. Hatch,*
   527 F.3d 1010 (10th Cir. 2008) ................................................................. 13, 15

*Howell v. Mississippi,*
   543 U.S. 440 (2005) ................................................................................. 10, 25

*King v. Emmons,*
   144 S. Ct. 2501 (2024) ....................................................................................48

*Miller-El v. Dretke,*
   545 U.S. 231 (2005) ................................................................................. 48, 49

*Mitchell v. Gibson,*
   262 F.3d 1036 (10th Cir. 2001) ......................................................... 13, 29, 33

*Phillips v. Workman,*
   604 F.3d 1202 (10th Cir. 2010) .....................................................................27

*Robedeaux v. Gibson,*
   189 F.3d 478, 1999 WL 672305 (10th Cir. 1999) ..........................................37

*Sexton v. Beaudreaux,*
   138 S.Ct. 2555 (2018) ......................................................................... 11, 31, 50

*Smith v. Aldridge,*
   904 F.3d 874 (10th Cir. 2018) ................................................................. 50, 51

*Taylor v. Workman,*
   554 F.3d 879 (10th Cir. 2009) ...................................................... 19, 27, 28, 36

*Thompson v. Quarterman,*
   292 F. App'x 277 (5th Cir. Aug. 19, 2008) ...................................... 38, 45, 46

*Threadgill v. Thaler,*
   425 F. App'x 298 (5th Cir. May 12, 2011) ........................................... 46, 47

*United States v. Branch,*
   91 F.3d 699 (5th Cir. 1996) ...........................................................................37

*United States v. McVeigh*,
  153 F.3d 1166 (10th Cir. 1998) ..........................................................**24**

*United States v. Moore*,
  96 F.4th 1290 (10th Cir. 2024) ..........................................................**48**

*United States v. Sinclair*,
  444 F.2d 888 (D.C. Cir. 1971) .................................................. **11, 38**

*United States v. Titties*,
  852 F.3d 1257 (10th Cir. 2017) ................................................. **24, 25**

*Valdez v. Bravo*,
  373 F.3d 1093 (10th Cir. 2004) ..........................................................**13**

*Walker v. Lee*,
  87 F. App'x 835 (4th Cir. Jan. 22, 2004) ..................................... **42, 43**

*Wellmon v. Colorado Dep't of Corr.*,
  952 F.3d 1242 (10th Cir. 2020) ......................................... **12, 31, 34**

*White v. Woodall*,
  572 U.S. 415 (2014) ......................................................... **15, 16, 23**

*Wiggins v. Smith*,
  539 U.S. 510 (2003) ......................................................................**48**

*Williams v. Taylor*,
  529 U.S. 362 (2000) ........................................................ **10, 13, 14, 22**

*Williams v. Trammell*,
  539 F. App'x 844 (10th Cir. Aug. 26, 2013) .....................................**27**

*Wood v. Allen*,
  558 U.S. 290 (2010) ......................................................................**16**

*Wood v. Carpenter*,
  907 F.3d 1279 (10th Cir. 2018) ..........................................................**48**

*Woodford v. Visciotti*,
  537 U.S. 19 (2002) ................................................................30

*Woods v. Donald*,
  575 U.S. 312 (2015) ...............................................................23

*Young v. Sirmons*,
  486 F.3d 655 (10th Cir. 2007) ......................................... 38, 40

### STATE CASES

*Fuston v. State*,
  470 P.3d 306 (Okla. Crim. App. 2020) ........2, 3, 9, 10, 22, 28-30, 35, 39, 40, 50

*Shrum v. State*,
  991 P.2d 1032 (Okla. Crim. App. 1999) ..............................18

### FEDERAL STATUTES

28 U.S.C. § 1291 ....................................................................2

28 U.S.C. § 2253 ....................................................................2

28 U.S.C. § 2254 .................................. 5, 10, 12-17, 22, 23, 30, 35, 36, 40, 47,48-51

### STATE STATUTES

Okla. Stat. tit. 21, 701.7 (Supp. 2012) ....................................1

Okla. Stat. tit. 21, § 701.8 (2011) ........................................29

Okla. Stat. tit. 21, § 1283 (Supp. 2012) ..................................1

### FEDERAL RULES

10th Cir. R. 28.1 ....................................................................2

Fed. R. App. 28 ......................................................................2

Fed. R. App. P. 4 ....................................................................2

## <u>PRIOR OR RELATED APPEALS</u>

There are no prior or related appeals in this Court.

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

RONNIE EUGENE FUSTON,

*Petitioner/Appellant*,

v.

CHRISTE QUICK, Warden,

*Respondent/Appellee*.

Case No. 24-6166

CAPITAL CASE

## RESPONDENT/APPELLEE'S RESPONSE BRIEF

Petitioner was convicted of one count of First-Degree Murder for killing Michael Rhodes ("Mr. Rhodes"), in violation of Okla. Stat. tit. 21, 701.7(A) (Supp. 2012), and one count of Possession of a Firearm after Former Juvenile Adjudication, in violation of Okla. Stat. tit. 21, § 1283(D) (Supp. 2012), in Oklahoma County Case No. CF-2012-348. The jury sentenced Petitioner to ten years imprisonment on the possession of a firearm charge. Regarding the murder, the jury found the existence of two aggravating circumstances: (1) Petitioner knowingly created a great risk of death to more than one person; and (2) the existence of a probability Petitioner would commit criminal acts of violence that would pose a continuing threat to society. Petitioner was sentenced to death.

Petitioner's convictions and sentences were affirmed on direct appeal to the Oklahoma Court of Criminal Appeals ("the OCCA"). *Fuston v. State*, 470 P.3d 306 (Okla. Crim. App. 2020), *cert. denied*, 141 S.Ct. 1400 (2021). Petitioner filed a federal habeas petition in the U.S. District Court for the Western District of Oklahoma on February 18, 2022, raising eight grounds for relief (ROA I 29-145).[1] The district court denied relief on July 12, 2024 (ROA I 1924-83).

After a Case Management Conference held April 22, 2025, Petitioner was granted a Certificate of Appealability ("a COA") on one issue: whether the state district court's denial of his requested second-degree murder instruction violated the Fourteenth Amendment (Doc. 35 at 1). This Court has jurisdiction pursuant to 28 U.S.C. §§ 1291, 2253 and Fed. R. App. P. 4(a).

For the reasons discussed herein, Petitioner's claim is meritless.

## ISSUES PRESENTED FOR REVIEW

1.    Whether a fairminded jurist could agree that the OCCA's adjudication of Petitioner's *Beck*[2] claim was neither contrary to nor an unreasonable application of clearly established Supreme Court law.

---

[1] Pursuant to 10th Cir. R. 28.1(A)(2), Respondent refers to the record on appeal ("ROA") by record volume and page number (*e.g.,* ROA [Vol. #] [page #]). Further. Pursuant to Fed. R. App. 28(d), this brief refers to the parties by their lower court designations, i.e., Petitioner/Appellant Ronnie Fuston as "Petitioner," and Respondent/Appellee Christe Quick as "Respondent."

[2] *Beck v. Alabama*, 447 U.S. 625 (1980).

2

2.    Whether all reasonable minds reviewing the record would agree that the OCCA's determination of the facts was incorrect.

## STATEMENT OF THE CASE

Petitioner was convicted of first-degree murder and sentenced to death after he shot Mr. Rhodes three times as he was laying on his couch holding his then three-year-old daughter J.R. ("J.R.") (Tr. IV 777, 796-98; Tr. V 1040-41; Tr. VII 1726, Tr. X 2241-43, 2289; Tr. XII 2917).[3] This was after Petitioner and his friends kicked down Mr. Rhodes's door looking for Mr. Rhodes's great-niece Brittany Dillard ("Ms. Dillard") to settle a gang-related dispute (Tr. IV 615; Tr. V 824-25, 953).

Petitioner raised fourteen propositions of error on direct appeal to the OCCA. *Fuston*, 470 P.3d at 318-33. He argued in Proposition VII that—pursuant to *Beck v. Alabama*—his Fourteenth Amendment right was violated by the state district court's refusal to instruct the jury on the lesser-included offense of second-degree murder. *Id.* at 324-26. The OCCA denied relief, affirming his convictions and sentences. *Id.* at 336.

Petitioner filed his federal habeas Petition on February 18, 2022, raising eight grounds for relief (ROA I 29-145). Petitioner claimed in Ground IV that the state district court's "failure to instruct on a lesser included offense violated the

---

[3] The transcripts of Petitioner's jury trial were conventionally filed below in the district court case 21-CV-179-SLP (ROA I 3).

Fourteenth Amendment" (ROA I at 121-128). Petitioner asserted that the OCCA unreasonably applied *Beck* in affirming the state district court's denial of his requested second-degree murder instruction because the evidence supported such an instruction (ROA I 121-28). Additionally, Petitioner argued that the OCCA unreasonably determined the facts "in the course of unreasonably applying *Beck* to focus on the evidentiary support for first-degree murder" (ROA I 126).

Then-respondent Jim Farris filed his response to the petition on April 19, 2022. Regarding the *Beck* claim, the respondent argued the OCCA reasonably found "no evidence to support a conviction for second-degree murder, which requires a lack of intent to kill" (ROA I 574). The respondent also argued *Beck* establishes only that a jury must not be given an all-or-nothing choice between death and acquittal, and because Petitioner's jury could have sentenced him to life with, or without, parole, *Beck* did not constitute clearly established federal law in this context (ROA I 580). Additionally, the respondent argued that the OCCA's decision was not based on an unreasonable determination of the facts (ROA I 585-86).

The district court denied relief on Petitioner's *Beck* claim on July 12, 2024 (ROA I 1924). The court concluded the OCCA's decision was not an unreasonable application of that Supreme Court decision. (ROA I 1960-65). Further, the district court similarly concluded the OCCA's decision was not based upon an unreasonable determination of the facts (ROA I 1964-65).

After a Case Management Conference held April 22, 2025, Petitioner was granted a COA on one issue: whether the state district court's denial of his requested second-degree murder instruction violated the Fourteenth Amendment (Doc. 35 at 1). He filed his opening brief on July 21 (Doc. 40-1 at 1). In his opening brief on appeal, Petitioner claims that the OCCA's denial of his *Beck* claim was unreasonable, and that a reasonable application of *Beck* would show he was entitled to his requested instruction (Doc. 40-1 at 14-40). Further, Petitioner claims the OCCA's denial was also based on an unreasonable determination of fact (Doc. 40-1 at 49-54). As explained *infra*, the OCCA's decision was not contrary to, nor an unreasonable application of, the clearly established law, nor was it based on an unreasonable determination of fact.

## STATEMENT OF THE FACTS

The OCCA set forth the relevant facts in its published opinion on direct appeal. Such facts are to be presumed correct under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). 28 U.S.C. § 2254(e)(1). According to the OCCA:

> [Petitioner] was convicted of shooting and killing Michael Rhodes (the decedent) on October 20, 2012, as [Mr. Rhodes] and his three (3) year old daughter sat on the couch in their Oklahoma City home. The crime was the result of an ongoing dispute between [Mr. Rhodes's] niece, Brittany Dillard, and a group of girls associated with the 107 Hoover Crips street gang.

Prior to the shooting, [Mr. Rhodes] and his wife opened up their home to seven (7) of his great nephews and nieces, who had been in the custody of the Department of Human Services. One of those nieces, Ms. Dillard, had been asked to leave the Rhodes' home because of behavior problems, but shortly before October 20, she was allowed to return. At the time of the shooting, Dillard was in a relationship with Terrell Howard, a Crips member. On October 19, 2012, Dillard became involved in a verbal altercation over the telephone with several women who answered her call to Howard's cell phone. These women, members of a subset of the 107 Hoovers known as the "Dulxw Girls," included Atiana Jordan (whose gang name was "Lady Bucky") and Taneecia Pennon (whose gang name was "Lady Get One"). They escalated the altercation by repeatedly calling Dillard on her cell phone, threatening her and her baby, and offering to fight Dillard. The women drove by the Rhodes' home more than once. An anxious Dillard called Chris O'Neal, the father of her baby, and a member of the bloods street gang. O'Neal drove to the Rhodes' home and fired gunshots at the Dulxw women. Jordan and Pennon called Dillard about the shooting and returned to the Rhodes' home, throwing rocks at the house and breaking two windows.

Returning home to find the broken windows, and concerned by what Dillard had told them, the Rhodes called the Department of Human Services and had the foster children picked up for their own safety. Dillard left the residence, to stay with O'Neal's mother, and Mrs. Rhodes and her daughter left the residence for the night.

Sometime late on the 19th or early on [the] 20th of October, the tires on the Rhodes' car parked in their driveway were slashed. The police were called and investigated the situation. Mrs. Rhodes spoke with Dillard about the situation and learned that Dillard continued to get phone calls and Facebook messages from the Dulxw women. Mrs. Rhodes also received numerous phone calls on her home phone from the Dulxw women. She

6

repeatedly told them that Dillard was not at their home and the women should not come back to the house.

The evening of October 20, Mrs. Rhodes went out to dinner with a friend while [Mr. Rhodes] stayed home with their daughter and nineteen (19) year old son, Jalon. [Mr. Rhodes] was on the couch with his sleeping daughter while his son was upstairs playing videogames. He was just about to fall asleep when the front door burst open and [Petitioner] and his companions entered the house firing weapons.

A few hours earlier, Jordan and Pennon called [Petitioner], a close friend and fellow member of the Hoover Crips. Despite the fact [Petitioner] lived in Enid, the Dulxw women asked him to come to Oklahoma City because of their conflict with Dillard. [Petitioner], accompanied by Brian Butler, drove to Pennon's Oklahoma City apartment. [Petitioner], Butler, Jordan, Pennon, Howard, and another "young guy" drove in two (2) cars to south Oklahoma City to "rob some Mexicans." When that effort did not prove fruitful, the group drove to the Rhodes' home looking for Dillard. As they drove, [Petitioner] communicated with Pennon, who was in a different car. The two cars stopped at a church near the Rhodes' residence and all but Butler got out and talked. The group then got back in the two cars and drove near the Rhodes' residence, parking down the street near a stop sign. [Petitioner] told the "youngster" to get in the driver's seat of his car while Butler waited in the passenger seat. [Petitioner], Pennon, Howard, and Jordan walked up to the residence. Gunshots rang out and [Petitioner] and Jordan ran back to the car. Initially reluctant to get into the car, Jordan was pulled into the car by [Petitioner], telling him "[we] were supposed to kill everybody in the house."

Upon hearing the gunshots, Jalon ran downstairs to find the front door open, his sister crying, and his father falling off the couch. Jalon sat his father up and called 911. [Mr. Rhodes] had been shot three (3) times. The fatal shot

7

entered his left shoulder before striking his aorta and both lungs. His blood sprayed on his younger daughter, but she had not been struck by the gunfire. She later told police that the "monsters hurt my daddy."

After leaving the Rhodes' home, [Petitioner] and his companions dropped Jordan off at their home then went to the home of Butler's cousin. There, [Petitioner] washed his hands in gasoline and told Butler that he fired (4) shots, and that "the dude was getting up or reaching for something." [Petitioner] routinely carried a .45 caliber Taurus Handgun. He had this weapon with him after the murder at the home of Butler's cousin and when he returned to Enid.

[Petitioner] and Butler drove back to Enid during the early morning hours of October 20. During that time, [Petitioner] changed his cell phone number. When Butler told him that the murder would come back to "haunt" him, [Petitioner] became angry and said he was tired of people telling him what to do and how to live his life. In the days and weeks that followed the murder. [Petitioner] told Butler that "the dude" had died but the "girl," presumably Dillard, would not testify because they were going to "handle it on the streets."

After his arrest, [Petitioner] denied being near the Rhodes' home at the time of the murder but his cell phone records placed him in the area. Other evidence established his relationship with Jordan and Pennon. A phone call from [Petitioner] while in jail to his cousin Treylon Haley led police to the murder weapon—a .45 caliber Taurus.

Based upon this evidence, the jury convicted [Petitioner] of first[-]degree malice murder. In the punishment phase of trial, the State sought the death penalty as punishment for [Mr. Rhodes's] murder and presented evidence supporting two (2) aggravating circumstances: 1) the defendant created a great risk of death to more than one person; and 2) the existence of a

probability that the defendant will commit criminal acts of violence that would constitute a continuing threat to society. *See* 21 O.S.2011, § 701.12(2) &(7).

In addition to incorporating all of the first stage evidence, the State presented evidence to support the alleged aggravating circumstances. The State's evidence showed that in 2009, [Petitioner] assaulted a fellow student and stole a cell phone. In September 2012, approximately one month before [Mr. Rhodes's] murder, [Petitioner] fired his weapon in a drive-by shooting in Oklahoma City striking the victim in the back. In December 2012, shortly after [Mr. Rhodes's] murder, [Petitioner] shot and killed Heath Crites in Enid, Oklahoma. The State's evidence also showed multiple instances where [Petitioner] attacked and assaulted other inmates while imprisoned.

In mitigation, the defense presented eight (8) witnesses. These included [Petitioner's] mother, sister, and twin brother; his Juvenile Affairs probation officer; staff members from Varangon Academy, a juvenile treatment center; and psychologist Dr. Terese Hall. After hearing all of the evidence in aggravation and mitigation, the jury found the existence of two alleged aggravators and sentenced [Petitioner] to death. The trial court sentenced accordingly.

*Fuston v. State*, 470 P.3d at 312-14 (paragraph numbers omitted).

## SUMMARY OF ARGUMENT

Petitioner's claim fails because there is no clearly established law applicable to his claim. Under AEDPA, a federal court may only grant habeas relief where the state court's decision is contrary to, or an unreasonable application of, clearly established law "as determined by the **Supreme Court** of the United States."

*Williams v. Taylor*, 529 U.S. 362, 381-82 (2000) (emphasis added); 28 U.S.C. § 2254(d)(1). In *Beck*, the Alabama statute at issue mandated the death penalty upon conviction of capital murder, barring instruction on lesser included offenses. *Beck*, 447 U.S. at 629. That was not the case here. Further, Supreme Court decisions post-*Beck* support such a conclusion. *See Howell v. Mississippi*, 543 U.S. 440, 444-45 (2005) (per curiam); *see also Hopkins v. Reeves*, 524 U.S. 88, 92-94, 96-99 (1998). Regardless, assuming *Beck* is clearly established, Petitioner's claim still fails.

Indeed, Petitioner has failed to meet his burden of showing the OCCA's denial of this claim was contrary to, or an unreasonable application of, clearly established law, or that it was based on an unreasonable determination of the facts. Here, the OCCA correctly recited and applied the *Beck* test (ROA I 581). *Fuston*, 470 P.3d at 324-25. Federal courts must "assume the state court is applying the correct federal legal standard when it *tells us* it is—and when viewed fairly it appears to be—doing just that." *Eizember v. Trammel*, 803 F.3d 1129, 1143 (10th Cir. 2015) (emphasis in original). The OCCA then correctly determined the relevant facts and, applying *Beck* to those facts, concluded, "[f]ar from showing second[-]degree murder, [Petitioner's] actions show his premeditated intent to kill anyone behind that front door." *Id.* at 325.

The only evidence Petitioner points to in support of his claims is that there was testimony stating he started firing almost immediately after Mr. Rhodes's door

was kicked open.[4] But this does not negate intent. Indeed, it supports intent, particularly in light of all the other evidence showing that the killing was premeditated. *(John) Grant v. Trammel*, 727 F.3d 1006, 1011-15 (10th Cir. 2013) (rejecting similar claim where there was little evidence showing lack of intent, and extensive evidence showing premeditation). Petitioner's inferences that the jury *could* have drawn from the evidence are based on nothing other than speculation and are thus insufficient to meet his burden. *Darks v. Mullin*, 327 F.3d 1001, 1006-11 (10th Cir. 2003) (affirming rejection of manslaughter instruction by the OCCA where "any inference of provocation is mere speculation[.]"); *United States v. Sinclair*, 444 F.2d 888, 891 (D.C. Cir. 1971) (noting courts cannot call on "abstract and speculative possibilities, not rooted in experience or evidence, as requiring the reversal of the ruling declining to give a lesser-included offense instruction").

Moreover, Petitioner's claim that the OCCA's decision was based on an unreasonable determination of fact is similarly meritless. Any purported evidentiary arguments other than the timing of the shots were not presented to the OCCA and cannot contribute to the finding that court's decision was unreasonable. *Sexton v. Beaudreaux*, 138 S.Ct. 2555, 2560 (2018) (per curiam) (noting that a circuit court may not consider arguments against a state court's decision that the petitioner did

---

[4] To be sure, Petitioner relies on other evidence, but because his argument on direct appeal relied solely on this one piece of evidence, that is the only fact this Court can consider here. *Sexton v. Beaudreaux*, 138 S.Ct. 2555, 2560 (2018) (per curiam).

not make before that court); *Wellmon v. Colorado Dep't of Corr.*, 952 F.3d 1242, 1249 (10th Cir. 2020) ("Petitioner's failure to make those arguments to the [state appellate court] sounds the death knell for them."). Further, his argument that the OCCA's decision was based on an unreasonable determination of the facts ignores that none of the "facts" on which he relies would actually support that he lacked the intent to kill. Moreover, his argument is merely an attempt to have this Court reweigh the facts and reach its own conclusions, which is not permitted under § 2254(d)(2). *Frederick v. Quick*, 79 F.4th 1090, 1104 (10th Cir. 2023). Accordingly, the OCCA's decision was not based on an unreasonable determination of fact.

## STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas relief with respect to a claim adjudicated on the merits by a state court only if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The threshold question for this Court on habeas review is whether Petitioner

12

seeks to apply a rule of law that was "clearly established" by the Supreme Court at the time of the state court's decision. *See House v. Hatch*, 527 F.3d 1010, 1018 (10th Cir. 2008). Where there is no clearly established federal law, that ends this Court's inquiry under § 2254(d)(1). *See id.* at 1018.

If a clearly established rule of federal law is implicated, however, then this Court must decide whether the state court's decision was contrary to, or an unreasonable application of, that clearly established rule of federal law. *See id.* A state court decision is contrary to clearly established federal law as determined by the Supreme Court when it applies a rule that contradicts the governing law set forth in the Supreme Court's cases or decides a case differently than the Supreme Court has on materially indistinguishable facts. *Williams*, 529 U.S. at 405-06; *Mitchell v. Gibson*, 262 F.3d 1036, 1045 (10th Cir. 2001).

A state court decision involves an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States when the state court correctly identifies the governing legal principle but applies it to the facts of the particular case in an unreasonable manner. *Valdez v. Bravo*, 373 F.3d 1093, 1096 (10th Cir. 2004); *Gilbert v. Mullin*, 302 F.3d 1166, 1171 (10th Cir. 2002). The Supreme Court has explained as follows regarding the "unreasonable application" clause:

> In § 2254(d)(1), Congress specifically used the word "unreasonable," and not a term like "erroneous" or "incorrect."

13

Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be **unreasonable**.

*Williams*, 529 U.S. at 411 (emphasis added).

The Supreme Court has further held that "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). As the Tenth Circuit has explained, the fairminded jurist test is a way of measuring reasonableness:

The Court's "fairminded jurists" test . . . serves as a proxy for "unreasonable application."  It is designed to help federal courts reviewing § 2254 habeas motions to determine whether a state court decision that would be incorrect under de novo review is also unreasonable. Under the test, if all fairminded jurists would agree the state court decision was incorrect, then it was unreasonable and the habeas corpus writ should be granted. If, however, some fairminded jurists could possibly agree with the state court decision, then it was not unreasonable and the writ should be denied.

*Frost v. Pryor*, 749 F.3d 1212, 1225 (10th Cir. 2014). *Frost* further stated that federal courts

may issue the writ only when the petitioner shows there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with the Supreme Court's precedents. Thus, even a strong case for relief does not mean that the state court's contrary conclusion was unreasonable. If this standard is difficult to meet—and it is—that is

14

because it was meant to be. Indeed, AEDPA stops just short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. Accordingly, we will not lightly conclude that a State's criminal justice system has experienced the extreme malfunction for which federal habeas relief is the remedy.

*Id.* at 1223 (quotation marks and citations omitted, alterations adopted, emphasis in original). This "fairminded jurists" standard applies to both the contrary to and unreasonable application clauses of § 2254(d)(1) and to § 2254(d)(2). *See Dunn v. Madison*, 583 U.S. 10, 12 (2017) (per curiam); *Brumfield v. Cain*, 576 U.S. 305, 313-14 (2015). In *Andrew v. White*, 145 S. Ct. 75, 82-83 (2025), the Supreme Court suggested that the fairminded jurists standard does not apply, however, to the question of whether clearly established law exists. But in *White v. Woodall*, 572 U.S. 415, 427 (2014), the Supreme Court said that "relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no fairminded disagreement on the question" (quotation marks omitted). It thus appears that it may be easier for a federal court to find clearly established federal law than this Court previously believed. *See House*, 527 F.3d at 1016 ("[C]learly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case *sub judice*."). However, any change appears to be one of terminology with no practical effect, for *Woodall* remains good law. *See Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016) ("Our decisions remain binding precedent until we

15

see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality." (quotation marks omitted)); *cf. Andrew*, 145 S. Ct. at 89 ("at best, today's decision will simply create an extra, unnecessary step judges must perform before they can deny a habeas claim that is doomed to fail") (Thomas, J., dissenting).

Additionally, state court determinations of fact "shall be presumed correct" unless Petitioner rebuts the presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). A state court's decision cannot be said to be based on an unreasonable determination of the facts until a petitioner has shown by clear and convincing evidence that the state court's factual determination was incorrect. *Black v. Workman*, 682 F.3d 880, 896-97 (10th Cir. 2012) (refusing to grant relief under § 2254(d)(2) because the petitioner had failed to present clear and convincing evidence to rebut a state court's factual finding); *but see Wood v. Allen*, 558 U.S. 290, 300-01 (2010) (declining to decide the relationship between § 2254(d)(2) and § 2254(e)(1)); *Grant*, 727 F.3d at 1024 n.6.

## **ARGUMENT AND AUTHORITY**

### **PROPOSITION**

**PETITIONER'S CLAIM FAILS FOR A LACK OF CLEARLY ESTABLISHED LAW. REGARDLESS THE OCCA'S DENIAL OF PETITIONER'S *BECK* CLAIM WAS NOT CONTRARY TO, OR AN UNREASONABLE APPLICATION OF, CLEARLY ESTABLISHED FEDERAL LAW, NOR WAS IT BASED ON AN UNREASONABLE DETERMINATION OF FACT.**

Petitioner's sole ground claims the OCCA's decision affirming the state district court's refusal to give a second-degree murder instruction was contrary to, or an unreasonable application of, clearly established Federal law (Doc. 40-1 at 16, 19).[5] Further, he claims that the OCCA's decision was also based on an unreasonable determination of fact (Doc. 40-1 at 49-53). But his claim fails for a lack of clearly established Supreme Court law, and in any event, the OCCA's denial of this claim was reasonable in light of the scant, speculative evidence at trial that he lacked the intent to kill. Similarly, the OCCA's decision was not based on an unreasonable determination of the facts.

---

[5] It appears Petitioner is relying on both the "contrary to" and the "unreasonable application of" prongs of § 2254(d)(1) (Doc. 40-1 at 16, 19 (arguing first that "Fairminded jurists could not disagree that [the] OCCA's adjudication contravened *Beck*," and then that "The district court erroneously upheld [the] OCCA's unreasonable application of *Beck*") (capitalization omitted).

17

## A. Background underlying this claim.

Petitioner first requested that the jury be instructed on second-degree murder during the defense's demurrer to the evidence. Specifically, Ms. Hammarsten stated as follows:

> I think that the evidence is clear that this was a homicide that was done with a depraved mind, with a reckless disregard for life, but without the intent to kill. [Mr.] Baxter's power point demonstrates that the kicking of the door and the firing on the home came fairly simultaneously. And I think that it was – the door was kicked open and the firing occurred, but for the fact that the homeowner was getting up the shots would have hit the fireplace and not him. And the evidence is, is that the gang girls prior – their intentions towards the home was vandalism and it was not to kill anyone. And so I think the evidence best first murder in the second degree.

(Tr. VII 1641). The state district court disagreed and denied that request (Tr. VII 1644).

The defense renewed the request for a second-degree murder instruction at the instructions conference. In making this request, defense counsel Catherine Hammarsten incorporated her argument from the defense demurrer, and also argued as follows:

> [W]hen we look at [*Beck v. Alabama*] and we look at [*Shrum*[6]] the question is whether the evidence supports the lesser included. It's not an elements test. It's an evidence test. And we look at what has been presented, not the elements of the crime. And where the facts indicate a lesser, even though the facts may also indicate the greater, the Court is obligated to give the lesser and the Court's refusal to do that, it's a

---

[6] *Shrum v. State*, 991 P.2d 1032 (Okla. Crim. App. 1999).

due process violation and it will diminish the reliability of the verdict. I would also point the Court to [*Taylor v. Workman*[7]] 554 F.3d 879, a 10th Circuit case in 2009. And in Taylor what had happened, he was charged with murder in the first[-]degree. And the facts of the case were that he had threatened to kill someone and had threatened to . . . more than one . . . person that he was going to do it. And he ended up firing at people and killed a woman who was with the man he had been threatening. And the court in that case said that the Murder II depraved instruction was warranted because even though he had intended to kill one person he did fire wildly. And we have an instance here where I think it's arguable that the door was kicked open and there was wild firing and that's what resulted in the death rather than a deliberate intent to take the life of someone.

(Tr. VII 1654-55). The state district court asked for the State's response, and they argued as follows:

Firing wildly into a crowd and killing someone without specific intent to kill any particular person, that is the quintessential second-degree murder. This case is entirely distinguishable from [*Taylor*] and that entire line of cases[.] What we have here is the kicking in of a man's door in his own house at nearly midnight[.] As soon as the door is kicked in five shots are fired, three of them hit him[,] killing him while he sleeps on the couch with his daughter. I think it would be an affront to justice to find that to be second degree murder. [If] [t]his isn't malice aforethought the way it occurred[,] [t]here is no such thing as malice aforethought. There simply isn't any evidence from which a jury could reasonably find that this was that type of second-degree murder, depraved heart.

(Tr. VII 1655-56). The state district court then reiterated its refusal to instruct on second-degree murder (Tr. VII 1657).

---

[7] *Taylor v. Workman*, 554 F.3d 879 (10th Cir. 2009).

19

In its published decision, the OCCA denied relief on Petitioner's claim under

*Beck v. Alabama*, writing as follows:

> In proposition VII, [Petitioner] contends the trial court erred in refusing his requested jury instruction on second[-]degree murder. He argues that in refusing his requested instruction, the trial court violated his federal due process rights under *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed. 2d 392 (1980). We review the trial court's denial of the requested instruction for an abuse of discretion. *Bench v. State*, 2018 OK CR 31, ¶ 68, 431 P.3d 929, 953. Absent an abuse of that discretion, this Court will not interfere with the trial court's judgment if the instructions as a whole, accurately state the applicable law. *Id.*

> "In *Beck*, the United States Supreme Court held that a sentence of death may not constitutionally be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." *Bench*, 2018 OK CR 31, ¶ 70, 431 P.3d at 954 (*citing Beck*, 447 U.S. at 637, 100 S.Ct. 2382). "However, *Beck* does not require that the jury in a capital case be given a non-capital option where the evidence absolutely does not support that option." *Id.*

> In *Bench*, we noted that "[a] *Beck* claim has two components. First, the appellant must establish that the crime on which the trial court refused to instruct was actually a lesser included offense of the capital crime of which he was convicted. Second, the appellant must show that the evidence presented at trial would permit a rational jury to find him guilty of the lesser included offense and acquit him of first[-]degree murder." *Id.* 2018 OK CR 31, ¶ 71, 431 P.3d at 954.

> Turning first to state law to resolve [Petitioner's] claim, as second[-]degree murder has historically been recognized as a lesser-included offense of first[-]degree murder, we conclude that the requested lesser offense was, in fact, a necessarily included offense of the charged crime. *Id.* 2018 OK CR 31, ¶ 74, 431 P.3d at 954. Therefore, [Petitioner] was entitled to an instruction on second[-]degree depraved mind murder if *prima facie* evidence of the offense was presented at trial. *Prima facie* evidence of a lesser-included offense is that evidence

which would allow a jury rationally to find the accused guilty of the lesser offense and acquit him of the greater. *Id.*

Murder in the second degree occurs "[w]hen perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual." 21 O.S.2011, § 701.8(1). Second[-]degree depraved mind murder is applicable where there is no premeditated intent to kill any particular person. *Harris v. State*, 2004 OK CR 1, ¶ 50, 84 P.3d 731, 750; *Williams v. State*, 2001 OK CR 9, ¶ 23, 22 P.3d 702, 712.

[Petitioner] relies on *Bench* to argue that because he fired into the victim's house, this was a "textbook case of second[-]degree murder." (Appellant's brief, pg. 76). In *Bench*, we recognized several examples of second[-]degree murder including "shooting into a crowd, where one does not intend to kill any particular person, but where the likelihood of death is probable." *Id.* 2018 OK CR 31, ¶ 76, 431 P.3d at 954-55.

[Petitioner] did not merely shoot into a crowd. The evidence showed that he was recruited by fellow gang members to find Brittany Dillard and kill her. He drove from Enid to Oklahoma City where he met with Jordan and others to formulate a plan to achieve that end. [Petitioner] and his accomplices went to Dillard's home. [Petitioner] kicked in the front door with the intention of shooting to kill Dillard and anyone else inside that house. [Mr. Rhodes] just so happened to be sitting on the couch near the front door. [Petitioner] fired at least five (5) times from close range, striking [Mr. Rhodes] three (3) times in the chest, shoulder and leg. [Petitioner's] statements, made after the fact that he shot the decedent not twice but four (4) times because he moved, shows this was more than merely firing into a crowd. Far from showing second[-]degree murder, [Petitioner's] actions show his premeditated intent to kill anyone behind that front door. Premeditation sufficient to constitute first[-]degree murder may be formed in an instant, or it may be formed instantaneously as the killing is being committed. *Williams*, 2001 OK CR 9, ¶ 25, 22 P.3d at 712. It may be inferred from the fact of the killing, unless circumstances raise a reasonable doubt whether such design existed. *Id.*

21

A review of the record shows [Petitioner] did not present any evidence, nor did the State's case provide any, that showed he engaged in imminently dangerous conduct in extreme disregard for human life *without* the intent of taking [Mr. Rhodes's] life. The evidence clearly supports a finding that when [Petitioner] fired at [Mr. Rhodes], he did so with the intent to kill. Therefore, we must conclude that the evidence would not have permitted a rational jury to find [Petitioner] guilty of second[-]degree depraved mind murder. Therefore, we find that the trial court properly refused [Petitioner's] requested instruction.

At the same time, we conclude that the evidence would not have permitted a rational jury to acquit [Petitioner] of the charged offense of first[-]degree murder. The medical examiner's testimony, corroborated by photographs, showed [Mr. Rhodes] was shot at close range, as he sat on his couch. Butler testified that [Petitioner] admitted shooting [Mr. Rhodes] and that Jordan had told him they were supposed to kill everyone in the house. No reasonable view of the evidence would permit a rational jury to acquit [Petitioner] of first[-]degree murder.

Since [Petitioner] has not shown that the evidence presented at trial would permit a rational jury to find him guilty of second[-]degree depraved mind murder and acquit him of first[-]degree murder we find the trial court did not violate [Petitioner's] federal due process rights under *Beck*. This proposition is denied.

*Fuston*, 470 P.3d at 324-26 (paragraph numbers omitted).

### B. Petitioner's claim fails for a lack of clearly established law.

Petitioner's claim fails because *Beck* is not clearly established law with respect to non-mandatory death penalty schemes, like the one in Oklahoma.

Under AEDPA, a federal court may only grant habeas relief where the state court's decision is contrary to, or an unreasonable application of, clearly established law "as determined by the Supreme Court of the United States." *Williams*, 529 U.S. at 381-82 (emphasis added); 28 U.S.C. § 2254(d)(1). Clearly established federal law

for purposes of § 2254(d)(1) includes "only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *Woods v. Donald*, 575 U.S. 312, 316 (2015). Further, relief is available under § 2254(d)(1) where "a state court unreasonably applies [the Supreme Court's] precedent," but it "does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error." *Woodall*, 572 U.S. at 426. Thus, where a habeas court "must extend a rationale before it can apply to the facts at hand," then "by definition the rationale was not clearly established at the time of the state-court decision." *Id.* (internal citations and quotations omitted). Accordingly, a precedent must be extended "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no fairminded disagreement on the question[.]" *Id.* at 427.

In *Beck*, the death penalty was mandatory upon conviction of capital murder. *Beck*, 447 U.S. at 629. The petitioner's argument there was that the "**prohibition** on giving lesser included offense instructions" in capital cases with an automatic death penalty violated the Eighth and Fourteenth Amendments. *Id.* at 632 (emphasis added). Further, the Court noted Alabama's prohibition on lesser-included offenses and mandatory death sentence was "unique in American criminal law." *Id.* at 635. Moreover, the Court noted repeatedly that it was concerned the case involved "an apparently **mandatory** death penalty statute[.]" *Id.* at 638-39, 642-43 (emphasis added). Accordingly, simply looking to the *Beck* decision reveals that it does not

clearly establish anything with respect to non-mandatory death penalty schemes, like the one in Oklahoma.

Respondent acknowledges this Court has rejected this argument that *Beck* is not clearly established with respect to non-mandatory death penalty schemes, like the one in Oklahoma. *See Hooks v. Ward*, 184 F.3d 1206, 1227-29 (10th Cir. 1999).[8] But because *Hooks* was reviewed *de novo*, the clearly established law requirement was not at issue, and that decision is therefore inapplicable here. *See United States v. Titties*, 852 F.3d 1257, 1273 (10th Cir. 2017) (noting one panel of the Tenth Circuit is not bound by another panel's dicta). Further, while cases post-*Hooks* have applied *Beck* where AEDPA was applicable, in none of those cases did the court specifically hold that *Beck* is clearly established law with respect to non-mandatory death penalty schemes. *See, e.g., Hogan v. Gibson*, 197 F.3d 1297, 1304 (10th Cir. 1999).

Moreover, looking to Supreme Court decisions post-*Beck* further supports that *Beck* is not clearly established law in this case. The Supreme Court first addressed the *Beck* decision in *Hopper v. Evans*, 456 U.S. 605 (1982). Notably, the Court

---

[8] Prior to *Hooks*, this Court had previously discussed in *United States v. McVeigh*, 153 F.3d 1166 (10th Cir. 1998) that that case was distinguishable from *Beck* because "the jury here was not compelled to impose the death penalty on McVeigh if it convicted him of the charged offenses; rather, it had the opportunity to reject the death penalty during the sentencing phase." *Id.* at 1197. But in *Hooks* the Court, in dicta, disapproved this statement from *McVeigh*. *Hooks*, 184 F.3d at 1226-27.

24

explained that the concern in *Beck* was "insuring that sentencing discretion in capital cases is channeled so that arbitrary and capricious results are avoided." *Id.* at 611.[9] Next, in *Hopkins v. Reeves*, 524 U.S. 88 (1998), the Court reversed the circuit court's conclusion that *Beck* required the giving of lesser included instructions. *Hopkins*, 524 U.S. at 93-94. The circuit court, relying on *Beck*, concluded there was a "distortion of the fact-finding process because [the] jury had been forced into an all-or-nothing choice between capital murder and innocence." *Id.* at 98. The Supreme Court explained that "[i]n so doing, the Court of Appeals overlooked **significant distinctions** between this case and *Beck*." *Id.* (emphasis added). One distinction the Supreme Court noted was that "[i]n *Beck*, the death penalty was **automatically** tied to conviction, and Beck's jury was told that if it convicted the defendant of the charged offense, it was **required** to impose the death penalty." *Id.* (emphasis added) (citing *Beck*, 447 U.S. at 639 n.15). The Supreme Court went further in *Howell v. Mississippi*, 543 U.S. 440, 445 (2005) (per curiam). There, the state court had held that *Beck* did not apply in the state because the death penalty was not automatic upon conviction. *Id.* The Supreme Court noted that conclusion "finds some support in our cases." *Id.* However, the Supreme Court dismissed the certiorari petition as

---

[9] Of further note, in the *Hooks* decision the panel believed that the Supreme Court's decision in *Hopper* indicated that *Beck* was concerned with the reliability of the conviction, not the sentence. *Hooks*, 184 F.3d at 1228. That the Supreme Court said the opposite is another reason this court should not follow the dicta from *Hooks*. *Titties*, 852 F.3d at 1273.

improvidently granted so this language is dicta. *But see Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1125 (10th Cir. 2015) (this Court is generally bound by the Supreme Court's dicta). Accordingly, the Supreme Court's decisions interpreting *Beck* support the conclusion that it is not clearly established in this case. Regardless, Petitioner's claim fails because the OCCA's decision was reasonable.

### C. The OCCA's decision was reasonable.

Petitioner's claim fails because the OCCA's decision was reasonable. Indeed, the OCCA properly recited and applied the *Beck* standard to the facts of this case. Further, Petitioner's anemic argument ignores that the evidence must be evaluated as a whole, not in isolation, and that the OCCA's decision is supported by the overwhelming evidence at trial.

### (1) The OCCA applied the proper *Beck* standard.

Petitioner argues in his opening brief that the OCCA's adjudication contravened *Beck* because the court "did not address the evidence that could have formed the basis for a lesser included offense" (Doc. 40-1 at 18). Further, he argues that a reasonable application of *Beck* required that the state district court instruct the jury on second-degree murder (Doc. 40-1 at 28-39).[10] Petitioner's arguments fail because the OCCA recited and applied the proper *Beck* standard.

---

[10] Below, Petitioner argued that the OCCA unreasonably applied *Beck* by focusing solely on the evidence supporting a first-degree murder instruction (ROA I 123-25), not that a reasonable application of *Beck* required a second-degree murder

Petitioner relies heavily on previous cases in which this Court has determined that the OCCA did not properly apply *Beck*.[11] However, the OCCA's previous cases have no bearing on this case so long as the OCCA *did* apply the proper standard here. *Cf. (Donald) Grant v. Royal*, 886 F.3d 874, 947 n.25 (10th Cir. 2018) (any "purported inconsistency" in the OCCA's cases is "inapposite").[12]

In each of the cases Petitioner relies on, the OCCA focused on the evidence supporting first-degree murder. *See Williams v. Trammell*, 539 F. App'x 844, 850 (10th Cir. Aug. 26, 2013) (unpublished) (the OCCA "ruled that an instruction on second-degree murder was not warranted *because* the evidence supported the conviction of first-degree murder") (emphasis in original); *Phillips v. Workman*, 604 F.3d 1202, 1212 (10th Cir. 2010) (the OCCA's determination regarding the "lack of evidence supporting a second-degree murder instruction," was erroneous because it was "based largely on its view that the evidence *did* support [the petitioner's]

---

instruction. Further, he does not request plain error review of this argument. Accordingly, this argument is forfeited, and unreviewable by this Court. *Hancock v. Trammell*, 798 F.3d 1002, 1011 (10th Cir. 2015) (holding claim was forfeited where not raised in district court, and declining to review for plain error where Petitioner did not request such review).

[11] Because Petitioner did not rely on all of these cases below, other than citing to *Taylor* and *Hogan*, (ROA I 124-25) this argument is also forfeited. *Hancock*, 798 F.3d at 1011.

[12] Petitioner also lists a number of other OCCA cases involving lesser offense instructions (Doc. 40-1 at 38-39). These cases are irrelevant per *Grant*.

conviction for first-degree malice aforethought murder") (emphasis in original); *Taylor v. Workman*, 554 F.3d 879, 887 (10th Cir. 2009) (the OCCA assumed that "if the evidence suggested a finding of first[-]degree murder, it therefore did not support a second[-]degree murder instruction"); *Hogan*, 197 F.3d at 1305 (the OCCA reasoned that the petitioner was not entitled to a manslaughter instruction because there was "sufficient evidence to support a finding of premeditation").

In *Taylor*, the Court explained that the OCCA should have analyzed "whether the evidence presented at trial was sufficient to allow the jury to find that the defendant shot at [the victim] without intending to kill him." *Id.* at 887-88. That is **exactly** what the OCCA did in Petitioner's case. Indeed, on direct appeal the State directed the OCCA to its own rule that "[t]he sufficiency of the evidence of the greater offense is distinct from the *Beck* inquiry into whether the evidence might allow a jury to acquit a defendant of the greater offenses and convict of the lesser" (ROA I 581). Further, the OCCA explained the *Beck* standard correctly, writing:

> In *Beck*, the United States Supreme Court held that a sentence of death may not constitutionally be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, **and when the evidence would have supported such a verdict**.

*Fuston*, 470 P.3d at 324 (citing *Beck*, 447 U.S. at 637) (emphasis added). Subsequently, the court explained further that Petitioner was entitled to a second-degree murder instruction "if *prima facie* evidence of the offense was presented at

trial," and that "*[p]rima facie* evidence of a lesser included offense is that evidence which would allow a jury rationally to find the accused guilty of the lesser offense and acquit him of the greater. *Fuston*, 470 P.3d at 325.

The OCCA conducted a proper *Beck* analysis. The court first explained that murder in the second degree occurs "when perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although **without any premeditated design to effect the death of any particular individual**." *Fuston*, 470 P.3d at 325 (citing Okla. Stat. tit. 21, § 701.8(1) (2011)) (emphasis added). Looking at the evidence as a whole,[13] the OCCA noted the following facts: (1) that petitioner was "recruited by fellow gang members to find [Ms. Dillard] **and kill her**;" (2) that he "drove from Enid to Oklahoma City where he met with [Ms. Jordan] and others to **formulate a plan to achieve that end**;" (3) that they went to Ms. Dillard's home; (4) that Petitioner "kicked in the front door **with the intention of shooting to kill** [Ms.] Dillard and anyone else inside that house;" (5) that Petitioner fired "at least five . . . times from close range," hitting Mr. Rhodes three times in the chest, shoulder, and leg; and (6) that Petitioner stated after

---

[13] As Respondent will explain in sub-point 2, Petitioner makes an inference from a singular piece of evidence and argues this entitled him to a second-degree murder instruction, ignoring much of the other evidence presented at trial. But that is not the standard pronounced in *Beck*. *Mitchell v. Gibson*, 262 F.3d 1036, 1050 (10th Cir. 2001) (the inquiry mandated by *Beck* requires the reviewing court to "assess whether the evidence at trial, **viewed as a whole**" warranted the lesser-included instruction) (emphasis added).

the murder that he "shot [Mr. Rhodes] . . . four (4) times because he moved[.]" *Fuston*, 470 P.3d at 325 (emphasis added).[14]

Far from determining the sufficiency of the evidence to sustain Petitioner's conviction, the OCCA determined there was *no* evidence supporting a second-degree murder instruction. Indeed, the OCCA concluded that "a review of the record show[ed] [Petitioner] did not present any evidence, nor did the State's case provide any" showing that Petitioner "engaged in imminently dangerous conduct in extreme disregard for human life *without* the intent of taking [Mr. Rhodes's] life." *Fuston*, 470 P.3d at 325 (emphasis in original). Accordingly, the OCCA concluded, "the evidence would not have permitted a rational jury to find [Petitioner] guilty of second[-]degree depraved mind murder[.]" *Id.* This is an entirely proper *Beck* analysis. *See Grant*, 727 F.3d at 1015 n.3.

Under AEDPA, this Court must presume that the OCCA knows the law and followed it in Petitioner's case. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). This Court must reject Petitioner's assumption, based on the OCCA's failure to expressly acknowledge certain "factual interpretations" (Doc. 40-1 at 31), that the OCCA did not appropriately apply *Beck. Id.*; *Eizember*, 803 F.3d at 1143. Furthermore, this

---

[14] Although Petitioner argues the OCCA's decision was based on an unreasonable determination of the facts, the only "factual finding" he challenges is the OCCA's conclusion that the evidence did not support a second-degree murder instruction (Doc. 40-1 at 49-54). Accordingly, all of these facts found by the OCCA must be considered to be correct. 28 U.S.C. § 2254(e)(1).

Court cannot consider "factual interpretations" Petitioner failed to argue to the OCCA. *Sexton*, 138 S.Ct. at 2560; *Wellmon*, 952 F.3d at 1249. Moreover, *Beck* claims must be supported by evidence, not speculation. For these reasons the OCCA's decision was not contrary to, or an unreasonable application of, *Beck*.

### (2) The evidence supports the OCCA's decision.

Furthermore, the OCCA's decision was reasonable because it is supported by the evidence. Viewing the evidence as a whole, the OCCA reasonably concluded that the evidence did not support a second-degree murder instruction. Petitioner relies largely on an inference from a singular piece of evidence, viewed in isolation (Doc. 40-1 at 30-38). He also points to other purported evidence which he speculates could have supported a second-degree murder instruction (Doc. 40-1 at 30-38). But this ignores the *Beck* standard.

For starters, the only fact Petitioner alleged on direct appeal in support of his claim for a second-degree murder instruction, and therefore the only fact on which he can rely here, was the short period between when the door was kicked in and when he started shooting (ROA I 583). *See Sexton*, 138 S. Ct. at 2560; *Wellmon*, 952 F.3d at 1249. But this in no way suggests a lack of intent to kill. If anything, it suggests the opposite.

Petitioner claims, "the kicking and shooting occurred simultaneously" and that he fired the shots "as the door was kicked open" (Doc. 40-1 at 31, 35). The

transcript does not fully bear out Petitioner's claim. The prosecutor was asking questions of a crime scene investigator about Mr. Rhodes' position when he was shot (Tr. V 949-53). The question at issue was whether "the fact that [Mr. Rhodes] is being stopped [from rising] almost immediately upon being alerted to something, would that indicate that the shooting came **almost** simultaneously or immediately **after** the door was kicked?" (Tr. V 953) (emphasis added). The officer responded that Mr. Rhodes's position was "consistent with that movement, yes." (Tr. V 953). From his interpretation of this testimony, Petitioner argues a juror could conclude he recklessly fired his gun as the door opened and did not intend to kill Mr. Rhodes. However, the testimony was that Mr. Rhodes's position was consistent with him being shot "almost simultaneously" with or "immediately after" the front door was kicked open. And it bears keeping in mind that Mr. Rhodes was falling asleep when the door was kicked so that his reaction might have been slower than if he had been fully awake (Tr. IV 795). Thus, there was sufficient time for Petitioner to see Mr. Rhodes and aim the gun at him before firing.

We know there was sufficient time because Petitioner admitted to Mr. Butler that he saw Mr. Rhodes moving (Tr. V 1052). Petitioner does not dispute Mr. Butler's testimony on this point. There is, therefore, no evidence that Petitioner did not intentionally, rather than recklessly, shoot at Mr. Rhodes. In fact, the **only** evidence is that he did intentionally fire the gun multiple times and that he

intentionally fired the gun **at** Mr. Rhodes. Petitioner was there to kill anyone behind the door as soon as it opened, and that is precisely what he did—firing five times and striking Mr. Rhodes three times, including in both lungs and his aorta (Tr. VI 1366-79). *Grissom v. Carpenter*, 902 F.3d 1265, 1291-92 (10th Cir. 2018) (concluding the petitioner's actions in shooting the victim twice in the head at close range "clearly established that he acted with the specific intent to kill her," while also concluding his trial counsel was not ineffective in failing to request a second-degree murder instruction because the evidence would not have supported a second-degree murder instruction). This conclusion is further supported when looking at the fact that Ms. Jordan stated, as Petitioner pulled her into the getaway car, they were supposed to kill everyone inside the house (Tr. V 1049). Thus, this singular fact that Petitioner began firing as soon as he saw someone did not entitle Petitioner to a second-degree murder instruction.

Further, Petitioner's arguments to the contrary—in addition to his reliance on any other purported facts—ignore the proper *Beck* standard and rely entirely on speculation. This Court has noted that—under *Beck*—courts must consider the evidence "as a whole" in determining whether the lesser-included instruction was warranted. *Mitchell*, 262 F.3d at 1050. Here, Petitioner points to at most three alleged facts he argues could have supported a second-degree murder instruction (Doc. 40-1 at 30-38), while failing to challenge much of the remaining evidence. These three

alleged facts are: (1) the "simultaneous" argument addressed above (which is properly before the Court); (2) Mr. Butler's alleged testimony that "the plan [was] to 'fight'—not kill—Dillard" (Doc. 40-1 at 31) (not properly before the Court);[15] and (3) that OCCA misstated the medical examiner's testimony (Doc. 40-1 at 32-33) (not properly before the Court).[16]

Assuming this Court could consider these additional alleged facts, they are inaccurate and irrelevant. Mr. Butler testified that, after Petitioner spoke with Ms. Jordan, he told Mr. Butler "that they got into a fight and they wanted him to come down there." (Tr. V 1023-24). Later, when Petitioner and Mr. Butler were in Oklahoma City, he got another phone call from Ms. Pennon advising him to go to "the girl's house", i.e., "[t]he girl that they were looking for that they had a fight with." (Tr. V 1040-41). The prosecutor asked Mr. Butler why he thought he and Petitioner had traveled to Oklahoma City (Tr. V 1041). Mr. Butler replied, "They said they were going to go look for the girl that had a fight – another fight, I guess."

---

[15] Neither of his claims regarding Mr. Butler's testimony were raised to the district court in support of Petitioner's argument that the OCCA unreasonably determined the facts, and thus these arguments are forfeited. *Hancock*, 798 F.3d at 1011.

[16] Petitioner raised no argument to the OCCA that the medical examiners testimony supported a lesser-included instruction, and thus this Court cannot consider that fact here. *Wellmon*, 952 F.3d at 1249. Moreover, this claim is also forfeited because it was not presented to the district court in support of Petitioner's argument that the OCCA unreasonably determined the facts. *Hancock*, 798 F.3d at 1011.

34

(Tr. V 1041). Mr. Butler never testified that the plan was to fight Ms. Dillard. He testified that there was a fight in the past and that he "guess[ed]" Petitioner was going to fight Ms. Dillard. This is not evidence; it is speculation and it in no way proves that Petitioner did not intend to kill when the door was kicked open.

Regarding Mr. Rhodes' injuries, the OCCA stated Petitioner "fired at least five (5) times from close range, striking [Mr. Rhodes] three (3) times in the chest, shoulder and leg. *Fuston*, 470 P.3d at 325. Petitioner obliquely disputes the accuracy of this finding and claims, essentially, that he was firing blindly, missed with two shots, and "one of [his] shots happened to fatally hit a person" (Doc 40-1 at 32-33). The medical examiner agreed when asked whether she "ha[d] indicated that there were three different areas where it appeared that Michael Rhodes was shot" and further answered in the affirmative when asked, "Three main areas. Would that be fair?" (Tr. VI 1367). And the medical examiner prepared a chart of the bullet wounds which depicted "three separate wounds" to Mr. Rhodes' "shoulder, leg and foot" (Tr. VI 1372-73). The gunshot that entered Mr. Rhodes' shoulder was fatal, "going into the chest and cavity which is through the second rib broken (sic) and get (sic) into lung" (Tr. VI 1379).

A bullet passed through Mr. Rhodes' chest. The OCCA's finding was accurate. More importantly, for purposes of § 2254(d)(1), the OCCA reasonably

considered the fact that Petitioner fired his gun at least five times and that one of the bullets passed through Mr. Rhodes' chest as evidence of Petitioner's intent to kill.

Once again, Petitioner's argument fails to consider the evidence as a whole. Petitioner told Mr. Butler that he shot multiple times because Mr. Rhodes was moving. The only conclusion that can be drawn from that admission is that Petitioner was intentionally directing his gunfire at Mr. Rhodes. This, combined with Mr. Butler's testimony that Ms. Jordan told Petitioner "they were supposed to kill everybody in the house" (Tr. V 1049), distinguishes this case from *Taylor*, in which the petitioner alleged that he was high, was assaulted by one individual, and fired blindly when he saw movement as he tried to flee the house. *Taylor*, 554 F.3d at 882-83, 890-93.[17] Petitioner's speculation would not make out a *Beck* claim on direct review, much less satisfy § 2254(d)(1).

For example, in *Darks*, 327 F.3d at 1006-11 the Court—reviewing de novo— rejected the petitioner's *Beck* claim that he was entitled to a heat of passion manslaughter instruction, reversing the district court's grant of relief. *Id.* at 1006-11. The Court explained, "[v]iewing the totality of the evidence presented at trial, an inference of provocation is **mere speculation** and therefore **insufficient** to establish the adequate provocation needed to support heat of passion manslaughter." *Id.* at

---

[17] Notably, in *Taylor* this Court also relied on the fact that the prosecutor did not object to a second-degree murder instruction and the trial court believed one was appropriate (but gave erroneous instructions). *Taylor*, 554 F.3d at 891.

1011 (emphasis added). Moreover, the Court reached the same conclusion in *Robedeaux*. There, the petitioner argued he was entitled to lesser-included instructions on second-degree murder and manslaughter. *Robedeaux v. Gibson*, 189 F.3d 478, 1999 WL 672305, at *6 (10th Cir. 1999) (table opinion). Regarding the second-degree murder instruction, the petitioner asserted his trial testimony showed he and the victim fought on several occasions in the past, "and the murder could have resulted unintentionally from such an incident." *Id.* This Court rejected that claim because the petitioner's version of events did not "square with the evidence." *Id.* at *7. The Court also explained that, to the extent he was claiming he and the victim had some other domestic dispute the night of the murder, this argument rested "on pure speculation[.]" *Id.* The Court concluded, "[s]pecultation about what might have happened" did not "constitute sufficient evidence to require a lesser included offense instruction under *Beck*." *Id.*

Thus, this Court has repeatedly rejected *Beck* claims premised on speculation, or on items of evidence viewed in isolation, and should do so again here. *See id.*; *Darks*, 327 F.3d at 1006-11. Such a conclusion is in accord with cases from other circuits. *See, e.g., Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001) (rejecting a petitioner's claim that he was entitled to a lesser-included offense instruction based "solely on his evaluation of the evidence."); *United States v. Branch*, 91 F.3d 699, 713-14 (5th Cir. 1996) ("In short, it is not enough that an item of evidence viewed

alone and unweighed against all the evidence supports an inference that a defendant acted in self-defense."); *Sinclair*, 444 F.2d at 891. Accordingly, Petitioner's speculative argument fails to meet his burden.

In any event, the evidence at trial supports the OCCA's decision, such that reasonable jurists could agree with that decision. Petitioner must establish there was "sufficient evidence to warrant" his requested instruction. *Young v. Sirmons*, 486 F.3d 655, 670 (10th Cir. 2007); *see Thompson v. Quarterman*, 292 F. App'x 277, 295 (5th Cir. Aug. 19, 2008) (rejecting *Beck* claim where the petitioner "fail[ed] to point to evidence that could show he lacked the intent to kill, or otherwise demonstrate entitlement to such an instruction.") (unpublished). Thus, to succeed on a *Beck* claim, the petitioner must show, "the evidence presented at trial would permit a rational jury to find him guilty of the lesser included offense and acquit him of first-degree murder." *Young*, 486 F.3d at 670. This Court's decision in *Grant* is applicable here.

In *Grant*, the petitioner claimed he was entitled to a second-degree murder instruction at trial. *Grant*, 727 F.3d at 1013, 1014. This Court disagreed, concluding, "a second[-]degree murder [instruction] was not warranted by the evidence." *Id.* at 1014. In so holding, the Court discussed the purported evidence on which the petitioner relied, specifically that his testimony established he was in a "dazed state of mind" at the time and could not remember the murder, and that his expert believed

he suffered from borderline personality disorder. The court held, "none of these facts . . . clearly and convincingly unseats the OCCA's finding that all of the evidence surrounding the killing suggested a degree of premeditation." *Id.* Accordingly, the Court "simply [could not] say that, given the facts in this record, a rational jury could have found that [the petitioner] acted 'without *any* premeditated design' to kill [the victim]." *Id.* at 1014-15 (emphasis in original) (quoting *Williams v. State*, 22 P.3d 702, 712 (Okla. Crim. App. 2001)).

Similarly, the purported evidence on which petitioner relies does not meet his burden of showing a rational jury "could have found that [he] acted 'without *any* premeditated design' to kill [Mr. Rhodes]." *Id.* at 1014-15 (emphasis in original). Here, the uncontroverted evidence on which the OCCA based its decision was Petitioner drove from Enid to Oklahoma City at the behest of fellow gang members, particularly Ms. Jordan and Ms. Pennon (Tr. VI 1427-52) (discussing cellphone records showing that Petitioner's communication with the "government phone" utilized by Pennon and Jordan increased in the hours leading up to the homicide). *Fuston*, 470 P.3d at 325. He met with those fellow gang members "to formulate a plan" to kill Ms. Dillard, and anyone else inside the home, and then they proceeded to drive through south Oklahoma City before heading to Mr. Rhodes's residence (Tr. VII 1592-1603) (discussing the cell location data for the government phone and Petitioner's phone number in the hours leading up to, and around, the homicide).

*Fuston*, 470 P.3d at 325. Petitioner does not attempt to rebut, with facts from the record, this finding by the OCCA that Petitioner planned to kill at the Rhodes' home. Accordingly, that fact is binding on him and this Court. 28 U.S.C. § 2254(e)(1).[18] And this fact, that Petitioner acted "with the intention of taking the life of any particular individual," is fatal to his *Beck* claim (OR XI 2157) (proposed instruction on second-degree murder).

At the home, Petitioner and his accomplices kicked in Mr. Rhodes's front door and Petitioner fired five shots, from a close range, intending to kill anyone behind the door (Tr. V 824-25, 883-84, 904). *Id.*; *see Grissom*, 902 F.3d at 1291-92 (concluding that the petitioner's actions in shooting the victim twice in the head at close range "clearly established that he acted with the specific intent to kill her," while also concluding that his trial counsel was not ineffective for failing to request a second-degree murder instruction because—for the same reason—the evidence would not have supported such an instruction). Further, subsequent testing confirmed that it was Petitioner's gun that fired all five shots (Tr. VI 1337-1342). These facts, standing alone, show Petitioner has failed to meet his burden. *Young*, 486 F.3d at 670.

---

[18] Petitioner claims there was "no evidence of a plot to kill the victim." (Doc. 40-1 at 45). This conclusory assertion is not clear and convincing evidence that the OCCA incorrectly concluded that there was such a plot. Petitioner cannot overcome Mr. Butler's testimony that Ms. Jordan told Petitioner "they were supposed to kill everybody in the house" (Tr. V 1049).

Further, that Petitioner was the one firing the gun was supported by the fact that he asked his cousin, Treylon Haley, to grab his guns from his mother's house via the jail Telemate system, and that another associate—Ivan Williamson—later sold the murder weapon to Casey Oakley, who ultimately turned it over to law enforcement (Tr. V 1195-99; Tr. VI 1231, 1262-68),[19] and that his cell phone location data placed him in the vicinity of the murder scene when the murder occurred (Tr. VII 1603). Additionally, Petitioner contacted his cell phone carrier to change his number shortly after the murder. (Tr. V 1055 (Brian Butler's testimony that Petitioner changed his cell phone number); Tr. V 1411-12, 1415 (testimony corroborating that petitioner changed his cell phone number)). Thus, none of the evidence or inferences on which Petitioner relies clearly and convincingly unseat the OCCA's finding that the evidence showed Petitioner had the requisite intent to kill. *Grant*, 727 F.3d at 1013-15. Accordingly, taking the evidence as a whole, a rational

---

[19] Indeed, Petitioner sent a Telemate message from the Oklahoma County Jail to his cousin Trelon Haley, asking Mr. Haley to send someone to Petitioner's mother's home to get his guns, or "hammers" as he called them in the message (Tr. V 1195). Mr. Haley then sent a Facebook message to Ivan Williamson saying "Bro, get at me" (Tr. V 1197-98). Mr. Williamson then retrieved the murder weapon, and other guns from Petitioner's mother's house, and sold Petitioner's .45-caliber Taurus pistol— the murder weapon—to an associate named Casey Oakley, who ultimately turned it over to investigators (Tr. V 1231, 1262-68). After selling the murder weapon to Mr. Oakley, Mr. Williamson messaged Mr. Haley back, stating "I got rid of them things. They gone so my n***a gonna be straight" (Tr. V 1198) (errors in syntax included).

jury could not acquit him of first-degree malice murder and convict him of second-degree murder, and the OCCA's decision was reasonable.

This conclusion is further supported when looking to how other circuits have examined evidence when reviewing *Beck* claims. For example, the Fourth Circuit's unpublished decision in *Walker v. Lee* is persuasive here. There the petitioner was convicted of first-degree murder and sentenced to death in North Carolina state court. *Walker v. Lee*, 87 F. App'x 835, 836 (4th Cir. Jan. 22, 2004) (unpublished). On habeas, he claimed that the state trial court unreasonably applied *Beck* in failing to instruct the jury on second-degree murder. *Id.* He argued that testimony from one witness alleging that he merely said he was going to "beat [the victim] up" undermined other testimony that he expressed an intent to kill the victim. *Id.* at 840. He also argued there were other inconsistencies in the evidence explaining what acts he committed in the course of murdering the victim. *Id.* The Fourth Circuit denied relief on this claim. In so holding the court noted that the conflicting testimony about whether the petitioner was going to beat up or kill the victim did not negate his intent to kill and merely showed his intent to beat up and kill the victim. *Id.* Further, the Court explained that any other inconsistencies did not negate that he acted with premeditation. *Id.* Thus, the Court concluded that the petitioner's alleged inconsistencies in the evidence did not negate the overwhelming evidence of his intent to kill the victim, and thus the state courts' decision rejecting his *Beck* claim

was not unreasonable. *Id.* Here too, Petitioner's alleged inconsistencies regarding whether he and his accomplices were merely going to the Rhodes home to beat up Ms. Dillard, along with any other alleged inconsistencies, cannot displace the overwhelming evidence showing Petitioner went to the Rhodes home with the intent to kill anyone there. *Id.* at 838-40. That a fight was going to happen does not negate that they were also planning to murder anyone at the home.

The Sixth Circuit has similarly concluded minor conflicts in the evidence are not enough to warrant lesser-included offense instructions. *See Goodwin v. Johnson*, 632 F.3d 301, 314-18 (6th Cir. 2011); *Campbell*, 260 F.3d at 541-45. In *Goodwin*, the petitioner claimed he was entitled to an instruction on involuntary manslaughter. *Id.* at 316-17. The Sixth Circuit concluded the Ohio Supreme Court's decision on this claim was reasonable. *Id.* at 317 (noting the petitioner provided only "paltry evidence" to the Ohio Supreme Court supporting his claim that the shooting was unintentional). In so holding, the Court noted that there was "extensive evidence that [the petitioner] was involved in the events that led to the victim's death." *Id.* And while there was "conflicting evidence concerning whether [the petitioner] intended to fire the revolver," the Court concluded this was "not enough to justify an instruction on the lesser-included offense." *Id.* Here, Petitioner also provided the OCCA with "paltry" evidence supporting his claimed lack of intent, specifically that he started firing almost immediately after the door was kicked in. This was woefully

insufficient to support his *Beck* claim then, and even now his claimed inconsistencies about whether there was going to be another fight, or the number of shots fired does not render the OCCA's denial of his *Beck* claim unreasonable in light of the extensive evidence of his intent to kill discussed above (Tr. V 824-25, 883-84, 904, 1055, 1195-99, 1231, 1262-68; Tr. VI 1337-42, 1411-15, 1427-52; Tr. VII 1592-1603). *Id.* at 316-17.

Further, the Sixth Circuit's decision in *Campbell* is similarly persuasive. There, the petitioner claimed the Ohio Supreme Court violated *Beck* when it concluded he was not entitled to a lesser-included instruction on involuntary manslaughter. *Campbell*, 260 F.3d at 541. In discussing the *Beck* decision, the court noted that "*Beck* has never stood for the proposition that the Constitution mandates a jury-mediated plea bargain on a lesser change, despite overwhelming evidence in support of the greater offense." *Id.* (citing *Hopper*, 456 U.S. at 607-10). The court also noted that the petitioner's argument was based "solely on his evaluation of the evidence." *Id.* In rejecting the petitioner's claim, the court noted with approval the Ohio Supreme Court's conclusion that the petitioner's claim was refuted by "the lack of evidence to explain away all five wounds to [the victim's] body." *Id.* at 543. Further, the court explained the petitioner's reliance on evidence of a struggle and a defensive wound to support that he stabbed the victim "reflexively with a purpose to escape . . . or cause a non-fatal injury" would require that court to conclude the

state court's conclusion was objectively unreasonable, which the Sixth Circuit declined to do. *Id.* at 544. The court reasoned that the petitioner simply urged "a different interpretation of the evidence," and the state court's conclusion was not unreasonable. *Id.* Accordingly, the Sixth Circuit concluded the petitioner's interpretation of the evidence was insufficient to entitle him to a lesser-included instruction in light of the overwhelming evidence of his intent to kill. *Id.* at 540-46. Here too, Petitioner's interpretation of the evidence is insufficient to show he was entitled to a second-degree murder instruction, particularly in light of the fact he fired five shots at the victim, striking him three times (Tr. VI 1373) (medical examiner's testimony that the victim suffered three gunshot wounds).

Additionally, the Fifth Circuit's decision in *Thompson* is similarly persuasive. In rejecting the petitioner's claim that trial counsel was ineffective for failing to request a lesser-included instruction, the Fifth Circuit noted with approval the state court's conclusion that the petitioner "fail[ed] to point to any evidence that affirmatively shows [he] did not intend the death of the victim or another," and that evidence of his intent to kill was "not merely sufficient, [but] overwhelming." *Thompson v. Quarterman*, 292 F. App'x 277, 295 (5th Cir. Aug. 19, 2008) (unpublished). The court reached a similar conclusion, holding the petitioner failed to "point to evidence that could show he lacked the intent to kill, or otherwise demonstrate his entitlement to [a felony murder] instruction." *Id.* Similarly,

Petitioner has not pointed to any evidence affirmatively showing he lacked the intent to kill anyone behind the door to the Rhodes home, and the evidence to the contrary is overwhelming, as discussed above. *Id.*

Moreover, the Fifth Circuit's decision in *Threadgill* is similarly persuasive. There the court rejected another petitioner's claim that his trial counsel was ineffective for failing to request a felony murder instruction. *Threadgill v. Thaler*, 425 F. App'x 298, 305-306 (5th Cir. May 12, 2011) (unpublished). The petitioner in that case pointed to four pieces of evidence he argued entitled him to a lesser-included instruction: (1) that the other passenger in the vehicle with the victim was not shot; (2) that the victim was only shot once; (3) that there was evidence showing the petitioner was unaware of the victim's presence in the vehicle; and (4) that the victim was taken out of the vehicle alive. *Id.* at 305. But the Fifth Circuit rejected this claim, concluding, "none of [the petitioner's] factual assertions and arguments" showed there was "even a scintilla of evidence from which a jury could have rationally concluded that [he] did not intend the natural consequence of his action— [the victim's] death—when he shot [the victim] in the chest at close range." *Id.* at 306. Similarly here, none of Petitioner's proffered evidence supports his claim that he did not intend the natural consequence of his actions—the death of anyone behind the door—when he kicked in the door and fired five shots at Mr. Rhodes, from close range (Tr. V 824-25, 883-84, 904). *Id.* at 305-306. Accordingly, the Fifth Circuit's

46

decision in *Threadgill* further supports the conclusion that the OCCA's decision was reasonable.

### (3) Conclusion

Thus, even assuming *arguendo* that *Beck* is clearly established law, the OCCA's denial of petitioner's claim was reasonable. Accordingly, Petitioner's claim should be denied.

### D. The OCCA's decision was not based on an unreasonable determination of fact.

Petitioner also argues he is entitled to relief based on the OCCA's alleged unreasonable determination of the facts (Doc. 40-1 at 49-53; ROA I 125-28). But because he challenges the OCCA's alleged failure to consider certain facts, rather than its *determination* of any factual issue, and fails to actually explain which factual findings were unreasonable, this claim also fails.

Petitioner's claim does not fall within the auspices of § 2254(d)(2). To be clear, Respondent is not arguing that a habeas petitioner may never rely on § 2254(d)(2) in a *Beck* claim, as Petitioner appears to believe (Doc. 40-1 at 50-51). If the state court unreasonably determined an historical fact on its way to denying a *Beck* claim, and the state court's decision was based on that finding, § 2254(d)(2) would apply. Here, however, Petitioner argues with the OCCA's application of *Beck* to the facts of his case (Doc. 40-1 at 51). Petitioner also argues the OCCA "omitted" evidence (Doc. 40-1 at 51-54).

47

"[A] state court's determination of whether the evidence presented at trial was sufficient under the *Beck* standard . . . is not a finding of historical fact, but rather a legal determination reached after assessing a body of evidence in light of the elements of the alleged lesser-included offense." *Gilson v. Sirmons*, 520 F.3d 1196, 1234 (10th Cir. 2008). Respondent agrees with Petitioner that this statement was dicta and not binding on this Court. *See United States v. Moore*, 96 F.4th 1290, 1300 (10th Cir. 2024). Accordingly, Petitioner's argument regarding the OCCA's ultimate conclusion is not reviewable under § 2254(d)(2). *See Frederick*, 79 F.4th at 1131 (legal conclusions are not subject to § 2254(d)(2)); *Wood v. Carpenter*, 907 F.3d 1279, 1291 (10th Cir. 2018) (same as to mixed findings of law and fact). The same is true of Petitioner's argument that the OCCA omitted certain facts. *Frederick*, 79 F.4th at 1109 n.8.[20] Further, Petitioner cannot rely upon arguments he did not make in state court. In any event, Petitioner has failed to satisfy § 2254(d)(2).

---

[20] Petitioner's only citation in support of his argument that § 2254(d)(2) applies to the omission of facts is to a dissent (Doc. 40-1 at 52-53 (citing *King v. Emmons*, 144 S. Ct. 2501, 2504 (2024) (Mem.) (Jackson, J., dissenting from the denial of certiorari)). The dissent relied on three Supreme Court cases (which, interestingly, Petitioner does not claim support his position). In *Brumfield*, the state court held that an IQ of 75 could not qualify someone as intellectually disabled despite the law providing that, because of the standard error of measurement, someone with an IQ as high as 75 may be intellectually disabled. *Brumfield v. Cain*, 576 U.S. 305, 314-16 (2015). In *Wiggins*, the state court found that incidents of sexual abuse were recorded in social service records but no such incidents were recorded. *Wiggins v. Smith*, 539 U.S. 510, 528 (2003). And in *Dretke*, the Supreme Court held unreasonable the state court's finding that the prosecutor did not exercise peremptory challenges based on race. *Miller-El v. Dretke*, 545 U.S. 231 (2005). The Court did

State court factual findings "are entitled to a presumption of correctness rebuttable only by clear and convincing evidence." *Frederick*, 79 F.4th at 1104. It is the petitioner's burden to show by clear and convincing evidence that the state court "plainly misapprehended or misstated the record," and that the "misapprehension goes to a material factual issue that is central to the petitioner's claim." *Id*. But this standard is "a restrictive one." *Id.* (quoting *Brumfield v. Cain*, 576 U.S. 305, 313-14 (2015)). Indeed, this Court cannot conclude a factual determination was unreasonable "merely because [the Court] would have reached a different conclusion in the first instance." *Id.* It is not enough for a petitioner to show "reasonable minds reviewing the record might disagree about the finding in question." *Brown v. Davenport*, 596 U.S. 118, 135 (2022). Thus, this Court "defer[s] to the state court's factual determinations so long as reasonable minds reviewing the record might disagree about the finding in question." *Id.* Accordingly, "a factual determination only qualifies as unreasonable . . . if **all** reasonable minds reviewing the record would

---

fault the state court for "ignor[ing]" and "ma[king] no mention of" certain facts. *Id.* at 246-47. However, the Court did not hold as follows: the state did not mention certain facts, ergo it made an unreasonable factual determination. Rather, the Court found the evidence contradicting the state court's finding overcame the evidence supporting it. Petitioner wants this Court to hold that the OCCA's failure to mention certain facts, or to mention a "potential alternative interpretation", satisfies § 2254(d)(2): "Ignoring these century, 'highly salient' facts . . . is paradigmatic of an unreasonable factual determination[.]" (Doc. 40-1 at 52).

agree it was incorrect." *Smith v. Aldridge*, 904 F.3d 874, 880 (10th Cir. 2018) (emphasis added) (internal quotations omitted; alterations adopted).

Petitioner's argument regarding the timing of the shots ignores that this does not actually support an inference that he lacked the requisite intent to kill. *Grissom*, 902 F.3d at 1291-92. Further, this argument simply urges this Court to interpret this fact differently than the OCCA, which is not permitted by § 2254(d)(2). *Frederick*, 79 F.4th at 1104. Additionally, this Court cannot consider any fact besides the timing of the shots because that was the only fact presented to the OCCA on direct appeal. *Sexton*, 138 S.Ct. at 2560. In any event, neither of the alleged facts on which he relies from Mr. Butler's testimony change the outcome here.

Indeed, Petitioner fails to show that the OCCA actually ignored evidence. Rather, the OCCA concluded—based on its review of the record—that none of the evidence "showed he engaged in imminently dangerous conduct . . . *without* the intent of taking the decedent's life," and that "the evidence would not have permitted a rational jury to acquit" him of first-degree murder and convict him of second-degree murder. *Fuston*, 470 P.3d at 325 (emphasis in original). Thus, the record does not support that the OCCA ignored these other pieces of evidence, but rather that it actually reviewed this evidence and reached the legal conclusion that it did not show his lack of intent. *Id.* Further, the OCCA noted Petitioner's statements to Mr. Butler that he shot four times because Mr. Rhodes moved. *Id.* Thus, Petitioner's argument

that this could have shown he shot merely because he was startled, or that he was actually at the *Rhodes* residence for another fight, is just another improper attempt to have this Court interpret the facts differently than the OCCA. *Frederick*, 79 F.4th at 1104.

Therefore, Petitioner has failed to meet his burden of showing that all reasonable minds reviewing this record would agree the OCCA's factual determinations were incorrect. *Smith*, 904 F.3d at 880.

## CONCLUSION

Petitioner has failed to meet his burden under either § 2254(d)(1) or (d)(2). Petitioner's claim fails for a lack of clearly established law. Further, even assuming *Beck* is clearly established, his claim fails because the OCCA's decision was not contrary to, or an unreasonable application of, the clearly established law. Finally, the OCCA's decision was not based on an unreasonable determination of fact. Accordingly, this Court should deny relief.

## STATEMENT OF ORAL ARGUMENT

Respondent requests oral argument. Although counsel believes the issues in this case have been sufficiently presented in the briefs, oral argument is appropriate in light of Petitioner's death sentence.

Respectfully submitted,

**GENTNER F. DRUMMOND**
**ATTORNEY GENERAL OF OKLAHOMA**

**s/ MICHEL A. TRAPASSO**
**MICHEL A. TRAPASSO, OBA #35298**
**ASSISTANT ATTORNEY GENERAL**
313 N.E. 21st Street
Oklahoma City, Oklahoma 73105
(405) 522-3002     FAX (405) 522-4534

Service emails: fhc.docket@oag.ok.gov
                          michel.trapasso@oag.ok.gov

**ATTORNEY FOR RESPONDENT**

## CERTIFICATE OF COMPLIANCE

**X**     This response complies with the typeface requirements of Fed. R. App. P. 32 because it was prepared in a proportionally spaced font (Times New Roman, 14-point) using Microsoft Word 2016. The document complies with the word limitation announced at the Case Management Conference, because it contains 13,642 words, excluding the parts exempted.

s/ MICHEL A. TRAPASSO

## CERTIFICATE OF SERVICE

**X**     I hereby certify that a copy of this Objection to Motion for Stay was electronically filed with the Clerk of this Court on September 19, 2025, and was served via the Court's CM/ECF filing system on the following registrants:

Callie_Heller@fd.org

s/ MICHEL A. TRAPASSO

## <u>CERTIFICATE OF DIGITAL SUBMISSION</u>

This is to certify that:

1.      All required redactions have been made and, with the exception of those redactions, every document submitted in Digital Form or scanned PDF form is an exact copy of the document filed with the Clerk;

2.      The digital submissions have been scanned for viruses with Symantec Endpoint Protection, Updated 9/19/25, and according to said program, are free of viruses.


<u>s/ MICHEL A. TRAPASSO</u>